PRESSMAN, ET AL. *v.* D'ALESANDRO, MAYOR, ET AL.

[No. 37, October Term, 1949.]

*Decided* Per Curiam *October 14, 1949.*

*Opinion Filed November 11, 1949.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MAR-
KELL, JJ.

*Hyman A. Pressman* for the appellants.

*Thomas N. Biddison, City Solicitor,* with whom were
*Edwin Harlan, Deputy City Solicitor,* and *John J.
Ghingher, Assistant City Solicitor,* on the brief, for the
appellees, the Mayor and City Council and the Board
of Estimates.

Submitted on brief by *Eugene M. Carozza* for the ap-
pellees, DeLuca-Davis Construction Co., Inc. and Fred-
erick D. Carozza & Co.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing on demur-
rer a taxpayers' bill against the City of Baltimore and
contractors for adjudication that a contract awarded by
the Board of Estimates for reconstruction of the existing
stadium is illegal and void and for injunction against
proceeding with work under the contract. On October
14, 1949 the decree was affirmed, for reasons now to
be stated.

By Chapter 97 of the Acts of 1947 the City was author-
ized to issue not exceeding $2,500,000 of certificates of
indebtedness (if an ordinance providing for the issuance
should be submitted to and approved by the voters as
required by Art. 11, sec. 7 of the constitution) and to
use the proceeds of sale for establishing and construct-
ing a new stadium or for reconstructing and improving
the existing stadium. Any ordinance submitted to the
voters was to provide for expenditure of the proceeds
of the loan in accordance with the provisions of the
charter of Baltimore, and by the municipal agency desig-
nated in the Annual Ordinance of Estimates of the City.
By Ordinance No. 828*, approved April 2, 1947, the Com-

---

* This, and all other ordinances referred to in the opinion appear in "Ordi-
nances and Resolutions of the Mayor and City Council of Baltimore, Passed at
the Annual Session, 1946-1947."

missioners of Finance were authorized to issue the $2,500,000 of certificates of indebtedness authorized by Chapter 97 of the Acts of 1947, for the same purposes, expressed in the same way as those specified in the act, with the same provision for expenditure of the proceeds. The ordinance was not to become effective unless approved by the voters. It was so approved on May 6, 1947. The Ordinance of Estimates for 1948 contained, in a list of "Estimates for New Improvements", an item "Department of Public Works, General, Stadium (to be taken from Stadium Serial 1953-1962 Loan) $2,500,000". On March 10, 1949 the Board of Estimates advertised for bids, to be opened on March 30, 1949, on a partial reconstruction of the existing stadium. The Board rejected all bids and on April 9, 1949 readvertised for bids on changed terms as to time of performance and liquidated damages for delay. On April 20, 1949 the bids were opened and the next day a contract was awarded to the defendant contractors at a price higher than the bids rejected in March.

In the bill plaintiffs charge that the action of the Board of Estimates in rejecting the lower bids in March and accepting a higher bid in April, in disregard of a previous recommendation of the Director of Public Works, who had advised against reconstruction of the existing stadium, "was arbitrary, incongruous and capricious conduct." As Judge Sherbow says, there is no charge or allegation of fraud or bad faith on the part of the Board, or of facts amounting to such a charge. As to acceptance or rejection of bids, cf. *Baltimore City v. Flack,* 104 Md. 107, 123, 64 A. 702; Baltimore Charter, adopted at the November, 1946 election, to become effective May 20, 1947, sec. 38. In this court plaintiffs' charge of misconduct (as distinguished from alleged lack of power) in rejecting or accepting bids has apparently been abandoned.

Plaintiffs' only contention in this court is that the Board of Estimates had no power to award a stadium contract without a previous ordinance deciding whether

to use the loan for (1) reconstruction of the existing stadium or (2) construction of a new stadium, at (*a*) the same or (*b*) a different location, *i.e.,* adopting one of the alternatives permitted by the enabling act and ordinance. The question thus presented is, whether power to make the choice of alternatives has been conferred or reserved to be exercised only by ordinance, or to be otherwise exercised by some municipal agency.

Plaintiffs say the power to choose is a legislative power conferred upon the City Council as such and not delegable by it. They quote a dictum in *Baltimore City v. Steward,* 92 Md. 535, 549-550, 48 A. 165, to the effect that a broad and unrestricted delegation of a power to decide whether a street shall be paved with asphalt or with brick would be unlawful. This dictum was explained and rejected as dictum in *Baltimore City v. Gahan,* 104 Md. 145, 152-153, 64 A. 716. If it were necessary for us to decide, we should be loath to hold that choice between the existing stadium and a new stadium at the same or a different location is a non-delegable legislative power, *e.g.,* is more than "the discretion necessarily belonging to a workman employed to do a work." *Baltimore v. Scharf,* 54 Md. 499, 522. The "necessary discretion" of a workman is relative to the nature and magnitude of the work. More discretion in administrative boards and expert officials is necessary in a project of the size and technical complexity of constructing or reconstructing a "modern stadium" than in laying a boardwalk in a Colonial village.

To call the question in the instant case a question of delegation of legislative power by the City Council is, however, to beg the question. The basic question now presented is not whether the City Council can delegate legislative power, but whether the Legislature has conferred, by the Baltimore charter or otherwise, power— of whatever nature, legislative or executive or both— to make the choice of alternatives. There can be no question as to the power of the Legislature to make such grants of powers of local government, whether to an existing municipal corporation or agency, a specially con-

stituted body, or an existing executive or administrative body such as county commissioners. The constitutional requirement of separation of powers is not applicable to local government. *Baltimore City v. Flack,* 104 Md. 107, 119-123, 64 A. 702; *Gordon v. Montgomery County,* 164 Md. 210, 212-214, 164 A. 676; *Schneider v. Lansdale,* 191 Md. 317, 326, 61 A. 2d 671, 675. Just how much power is granted by a particular statute is a question of statutory construction, (*Renshaw v. Grace,* 155 Md. 294, 142 A. 99), not a constitutional question. In the past municipal charters, through imitation of state and federal constitutions, often made a separation of powers similar to the constitutional separation. Such charters gave rise to questions of statutory construction similar to constitutional questions of separation of powers. *Baltimore v. Wollman,* 123 Md. 310, 316, 91 A. 339. The new Baltimore charter and other recent charters reflect less imitation of state and federal frames of government and greater recognition of functions and problems characteristic of municipal government.

Section 6 of the new charter provides that the powers thereby granted to the City [not the legislative powers granted to the City Council] may be exercised "by ordinance, or such other method as may be provided for in its charter". Among the powers of the City granted by section 6 is power "to establish, maintain, control and regulate parks, squares, monuments and recreation facilities." Section 6(19). Under section 96 the Board of Recreation and Parks has power "(a) to establish, maintain, operate and control * * * athletic and recreational facilities and activities for the people of Baltimore City * * *" and "(g) to charge and collect * * * rentals for the use of property controlled by it; * * *". In *Green v. Garrett,* 192 Md. 52, 57-63, 63 A. 2d 326, 328-330, we held that these powers of the Board include power to lease the stadium [as "property controlled by it"] for professional baseball. We think power to "establish, maintain, operate and control" a stadium and to charge rentals for the use of it, which includes

power to lease it, necessarily includes power to construct or reconstruct it and to that end to make the choice of alternatives between reconstruction of the existing stadium and construction of a new one. Since section 96 thus provides for an "other method" of exercising this power of choice, it need not be exercised by ordinance.

We see no conflict or inconsistency between these provisions of section 96, thus construed, and the provisions of section.30 (requiring inclusion of the necessary appropriation in the annual Ordinance of Estimates), section 68 (empowering the Building Construction Engineer, in the Department of Public Works, to expend loan proceeds), section 67 (c) (giving the Director of Public Works supervision of all engineering questions and matters connected with all public improvements made by or for the City), section 67 (h) (requiring approval of plans by the Board of Estimates) or section 38 (requiring award of contracts by the Board of Estimates). It is not unnatural or unreasonable that such a project as the stadium should at various stages require action by various municipal departments and agencies. These many departments and agencies normally function as co-operating parts in an integrated whole, not like warring ideas in a schizophrenic mind. At all events, the fact that this project requires action by so many different departments and agencies is no reason for reading into the charter an implied requirement of action by the City Council a third time by an ordinance making the choice of alternatives.

The purpose and effect of the enabling act of 1947 was to give the City the authority required by the constitution to create a debt. The act does not purport or operate to amend the charter or to repeal or withhold, with respect to the stadium, any of the powers conferred by section 96. The authority granted by the act must be exercised by the City under its charter, as from time to time in effect, especially the amended charter adopted by the voters on November 5, 1946, before the passage of the enabling act, though to become effective May 20,

1947, two weeks after approval of the loan by the voters. *Cf. Elgin v. Capitol Greyhound Lines*, 192 Md. 303, 64 A. 2d 284.

Plaintiffs also contend that by Ordinance No. 828 the City Council intended to reserve to itself the choice, by a subsequent ordinance, between the alternatives of a new stadium or the existing stadium. Since the words of the ordinance and the words of the enabling act are practically identical, what we have said about the enabling act would seem equally applicable to the ordinance. However, we also concur in the fuller discussion by Judge Sherbow of the construction of the ordinance:

"When the City Council passed Ordinance No. 828 submitting the loan to the voters for their approval, did that body intend to retain any further control over the stadium site, or did the City Council intend that the proceeds of the loan should be spent in the same manner as other loan funds?

"An examination of other ordinances submitting loans to the voters leads to the conclusion the second proposition is correct. A number of loans were authorized by the Legislature and subsequently approved by the voters. (See Ordinances 500 and 816, Airport; 817, Buildings; 819, Court House; 818, Jail; 821, Library; 831, Off Street Parking; 822, Park Buildings; 519, Paving; 823, People's Court; 824, Play Grounds; 825, Redevelopment; 826, School Equipment; 829, Schools; 827, Sewers; 501, Water.) All of these ordinances use the same general phraseology providing that the expenditures shall be in accordance with the provisions of the Charter and by the municipal agency designated in the Annual Ordinance of Estimates.

"Where the City Council intended to reserve to itself future action, it affirmatively said so. For example, Ordinance 817, Sec. 10, the General Buildings Loan, provided for the acquisition by purchase or condemnation of land and the erection of buildings 'as may be provided from time to time by ordinance or ordinances of the Mayor and City Council of Baltimore.' Even if the

buildings are on land already owned by the City an ordinance is necessary. An ordinance was required for the People's Court project.

"Strangely enough, while no reservation was made by the City Council in the Stadium plan, it specifically reserved the power of control over the expenditure of the loan proceeds for the improving and modernizing of the Court House. See Ordinance 819, Sec. 6, (approved April 2, 1947), where the expenditures may be made as 'authorized from time to time and provided for by ordinance or ordinances of the Mayor and City Council of Baltimore.'

"Thus we see that where the City Council wished to retain some control, it specifically said so in the ordinance submitting the loan. Where it desired to name some other agency it did so, as in Ordinance No. 831, Off Street Parking. In the matter of the Stadium Loan the Council made no specific delegation to the Board of Recreation and Parks, as it had a right to do. It simply appropriated the money to the Department of Public Works, in the Annual Ordinance of Estimates, just as the Enabling Act and the Ordinance No. 828 provided."

For the reasons above stated the decree below was affirmed with costs.