## WICOMICO COUNTY, MARYLAND *v.* TODD, ET AL.

[No. 260, September Term, 1969.]

*Decided January 9, 1970.*

460

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*David H. Clark, County Attorney,* and *William C. Stifler, III,* with whom were *William O. Doub* and *Niles, Barton & Wilmer* on the brief, for appellant.

*Patrick L. Rogan, Jr.,* with whom were *Richardson, Rogan & Anderson* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

This appeal exists because Wicomico County, a charter county, is having difficulty in enacting a bond bill which will satisfy bond counsel, to provide funds for its five year Capital Improvement Budget, consisting of twelve projects including an office building, schools, a mental retardation center, playgrounds and airport estimated to require, above State and Federal contributions, $3,402,018. In the February 1969 legislative session, the County Council enacted Chapter 1, Bill 1 (Bill 1), which authorized the issuance of general obligation bonds in the amount of $3,402,018. Section 309 (a) of the Wicomico County Charter provides that:

"The people of Wicomico County reserve to

themselves the power, by petition, to have submitted to the registered voters of the County, for approval or rejection by them by a majority vote, at the next regular or special election in Wicomico County for any state or federal office, any public local law or any part of any public local law hereafter passed, including any public local law or any part of any public local law authorizing any issue of bonds, certificates of indebtedness, notes, or other obligations of the County, or renewal thereof."

Section 309 (b) provides that:

"Any referendum petition hereunder shall be filed with the Board of Supervisors of Elections within forty-five days after the close of the Legislative Session at which the subject of the referendum was passed, and shall bear the signatures of ten per centum of the registered voters of the County."

(Section 308 (g) directs that generally laws shall take effect forty-five days after the close of the Legislative Session.) Sections 309 (c), (d) and (e) provide the mechanics of the referendum process, and paragraph (d) provides that if a proper petition containing the signatures of at least 10% of the registered voters of the County is duly filed within forty-five days after the close of the legislative session at which the subject of the referendum was passed: "said public local law shall not become effective until thirty days after its approval by a majority of the qualified voters voting thereon."

A taxpayers' group identified as the National Taxpayer Coordinating Committee (NTCC) circulated petitions to put Bill 1 to referendum. At 9:30 a.m. on March 31, 1969, the last day of the forty-five day period following the February 1969 legislative session, the referendum petitions were filed with the Board of Election Supervisors of Wicomico County. At 4:00 p.m. that same day the County

Council in executive session vetoed Bill 1 pursuant to § 404 of the Charter, reading:

"To guard against hasty legislation and afford the people of the County adequate opportunity to express their will, no bill, except emergency measures as provided in Article III, Sec. 308 (g) of this Charter, shall become law until 45 days following the close of the Legislative Session. Within the 45 days aforesaid any person shall have the right to petition the County Council, or on written application to appear in person before it in Executive Session, and state his reasons why the bill should not become law. Prior to the expiration of said 45 day period, the County Council in Executive Session shall have the right, as the chief executive authority of the County, by the affirmative vote of four members, to veto a bill; and if vetoed, the bill shall not become law. If not vetoed, the bill shall become law on said 45th day next following the last day of the Legislative Session in which passed, unless the bill is subjected to a valid referendum under this Charter. In the latter event, the bill shall become law on the 30th day following approval by the voters at the election, but not otherwise. Emergency measures may be vetoed in the same manner as hereinbefore provided, except such laws shall be effective until the date of veto, and subject to referendum as provided in Article III, Sec. 309."

The Council also issued a veto message addressed to the citizens of the County and later published, which read:

"Pursuant to Article IV, Section 404 of the Charter of Wicomico County, Maryland, we have today vetoed Chapter No. 1, Bill No. 1 of the First Legislative Session of 1969. Due to the unique nature of this act, we offer to you,

the citizens of Wicomico County, the following in explanation of this course of action.

"The Capital Budget for fiscal year 1970-71 was passed by this Council on January 14, 1969. The Council after long deliberation and due public hearing and notice, deleted in excess of $850,-000.00 from the budget as originally submitted for 1970-71. It was and is the considered judgment of the Council that the programs provided for in the Capital Budget are necessary for the continued progress of this County. At no time during our deliberations was there an indication that any portion of this Legislation would be brought to referendum. We cannot, now, in good conscience, allow the consequences of the delay this referendum would cause to all of the citizens of the County for the desires of a number to vote their wishes, when the major concern seems to be $49,000.00 out of a $3,400,-000.00 capital program.

"We are most reluctant to veto this legislation inasmuch as we realize that a situation such as this was not the reason for the veto power being given the Council when the Charter was adopted. We are convinced, however, that the great majority of the citizens of this County do not wish to delay these projects for two years and thereby cause our children to receive inferior educational opportunity, possibly lose a much-needed mental retardation facility and further eventually require the taxpayers to fund the additional costs that a two-year delay would cause.

"By vetoing this Bill, we have provided the only opportunity to return in our June Legislative Session and provide the necessary legal machinery to reintroduce a bill to implement these much needed improvements. There is no question

"but what even this slight delay will mean increased costs to the citizens of this County. We feel, however, that our responsibility to the majority of the public requires that we take this action in order to minimize the cost and inconvenience to all of us in the County."

At its June 1969 Legislative Session the County Council passed Chapter 2, Bill 2 (Bill 2), which is a twin of Bill 1. Neither the taxpayers' group nor anyone else attempted to refer any part of Bill 2. Instead, the appellees, acting either in their own right or on behalf of the taxpayers' group, chose to seek a decree which would declare:

1. The veto power in the Wicomico County Charter to be unconstitutional,
2. The veto of Bill 1 to be invalid and ineffective,
3. Bill 2 to be invalid and ineffective, and
4. Would order that Bill 1 be placed on the ballot in the next general election (in November 1970).

Judge Travers held the veto provisions of the Charter to be valid and that Bill 1 had been lawfully and effectively vetoed, but that the Council could not enact a bill substantially like the one that would have gone to referendum had it not been vetoed, because this would nullify the right the people reserved to themselves to vote directly on whether they do or do not want a proposed law.

We think that Judge Travers was right as to the veto power and the vetoing of Bill 1 but wrong in holding that Bill 2 was invalid and ineffective.

The argument of the appellees below — an argument they now do not seriously press—was that to allow the County Council in executive session to veto a bill it had enacted in legislative session violates Article 8 of the Declaration of Rights of the Constitution of Maryland, which commands the separation of legislative, executive and judicial powers and provides that "no person exercising the functions of one of said Departments shall

assume or discharge the duties of any other." The short answer is that it was reiterated in so many words in *Pressman v. D'Alesandro*, 193 Md. 672, 679, that "the constitutional requirement of separation of powers is not applicable to local government," the question of just how much power has been granted being one of statutory construction. Judge Markell for the Court added:

> "In the past municipal charters, through imitation of state and federal constitutions, often made a separation of powers similar to the constitutional separation. Such charters gave rise to questions of statutory construction similar to constitutional questions of separation of powers. *Baltimore v. Wollman*, 123 Md. 310, 316, 91 A. 339. The new Baltimore charter and other recent charters reflect less imitation of state and federal frames of government and greater recognition of functions and problems characteristic of municipal government."

Article XI-A of the Constitution of Maryland obviously contemplates that the legislative branch of the government of a charter county may act executively. Section 3 thereof requires every charter to provide an elective legislative body to pass laws, and then provides:

> "The chief executive officer, if any such charter shall provide for the election of such executive officer, or the presiding officer of said legislative body, if such charter shall not provide for the election of a chief executive officer, shall be known in the City of Baltimore as Mayor of Baltimore, and in any County as the President of the County Council of the County * * *."

The Wicomico County Charter, it is apparent, was modeled after that of Montgomery County and the permissible executive functioning of the Montgomery County Charter was at least implicitly recognized in *Scull v. Montgomery Citizens League*, 249 Md. 271.

The pertinent parts of the Wicomico County Charter, read together, make it clear that a bill may be vetoed within the prescribed 45 days although a referendum petition previously has been filed. Section 404 says the Council in Executive Session, as the "chief executive authority of the County [shall have the right to] veto a bill" and "if vetoed, the bill shall not become law." The right reserved to the people is the right directly by the ballot to approve or disapprove a bill which would be law 45 days after the close of the legislative session at which it was passed, unless it were referred, not a bill which, by reason of a veto, has been killed just as it would be if disapproved by the electorate. It is perhaps awkward that the same period of 45 days is specified for vetoing and for referring a bill, but the language of § 404 indicates to us the intent that only a bill that is not vetoed within 45 days can be referred, when it says: *"if not vetoed,* the bill shall become law on said 45th day next following the last day of the Legislative Session * * * *unless"* the bill is validly referred, in which case it becomes law 30 days after approval by the voters (emphasis added). There would be no point in giving the opportunity to the voters to kill a bill that their elected representatives had already killed. An analogous view was taken in *Keigley v. Bench* (Utah), 63 P. 2d 262; and *Ginsberg v. Kentucky Utilities Co.* (Ky.), 83 S.W.2d 497.

The critical question is whether the Council could pass an identical bill at the next legislative session after it had vetoed Bill 1.

Various courts have held that the filing of a sufficient and timely referendum petition suspends the legislative enactment against which it is directed, and during such suspension the legislative body cannot pass a valid measure which is substantially the same as that referred. See 5 McQuillen, *Municipal Corporations,* 1969 Revised Vol. § 16.53, p. 208; 1 Antieau, *Municipal Corporation Law,* § 4.14, pp. 210.10-210.14; Annot., *Legislature — Initiative-Referendum,* 33 A.L.R.2d 1118, 1130-1134;

Note, 49 Col.L.Rev. 705. Courts have found valid subsequent legislation on the same subject matter as that amended or repealed, if the legislative body acted in true good faith to accomplish proper and appropriate governmental ends. Good faith and proper purpose have been found where the later enactment carries changes calculated to meet objections that produced the referendum. *Ex Parte Statham* (Cal. D. Ct. App.), 187 P. 986; *Ginsberg v. Kentucky Utilities Co., supra; Hall v. City & County of Denver* (Col.), 177 P. 2d 234; and *Utah Power & Light v. Ogden City* (Utah), 79 P. 2d 61. Other States have found justification for the second law in an emergency requiring prompt legislation. *See In re Opinion of the Justices* (Mass.), 191 N. E. 33; *McBride v. Kerby* (Ariz.), 260 P. 435.

This Court held in *Hitchins v. Mayor & C.C. of Cumberland,* 215 Md. 315, that the City of Cumberland could effectively modify an ordinance by amendment after the filing of a referendum against it. In *First Continental Savings & Loan Ass'n v. Director, Dep't Assess. & Tax.,* 229 Md. 293, we upheld the passage by the legislature as an emergency measure of a law identical in substance to one that had been referred (in the face of an argument that the second law was void because "a mere subterfuge to nullify the people's power of referendum"). *See also Hammond v. Lancaster,* 194 Md. 462.

In the case before us we think the Wicomico County Council acted in entire good faith for proper and appropriate governmental reasons in enacting Bill 2 and not merely to avoid the referendum on Bill 1. The veto message and the testimony indicate this. The message gave two reasons for the veto and the proposed repassage of Bill 1 in June several months later: 1—Only $49,000 of the $3,400,000 capital budget was objected to by the taxpayers' group that filed the referendum petitions. 2—The Council could not "in good conscience" permit a delay until late 1970 in construction of badly needed projects desired by, in the opinion of the Council, "the great

majority of the citizens of this County" with the consequences of inferior educational facilities and opportunities, the possible loss of a much needed mental retardation center (loss of State and Federal grants), and the added expense of rising interest costs and rising building costs. The feeling of an emergency induced by a growing school population and inadequate educational facilities, and rising costs of money and construction obviously prompted the Council to avoid a delay of several years.

The testimony impels the findings that Bill 1 was vetoed not only at the suggestion of the County attorney but that of the president of NTCC and of citizens who had signed the referendum petitions with the objective of repassing the bill in June. It would appear that (possibly because the Charter had been in effect only since 1965) the NTCC thought it was necessary to refer the entire Bill 1 in order to knock out the items that it objected to, when in fact under § 309 of the Charter "any public local law or any part of any public local law," including bond bills, may be referred.

Mr. Wooton, president of the Council, testified that the veto had been suggested by Mr. Hitch, president of the NTCC, in an executive session of the Council. Mr. Wooton said Mr. Hitch "suggested that if we were to remove a total of $49,000, which was $30,000 for a high school planning appropriation and $19,000 for recreational land purposes the bill would then be reasonably satisfactory" and that the Council knew of no other way to meet the objections of the petitioners to the $49,000 items other than to repass the bill. It is apparent that the second bill could have eliminated the $49,000 items but the Council kept them in knowing that those figures could and probably would be referred after the new bill was passed at the June legislative session. The Supreme Court of Minnesota decided a significantly similar case in *Anderson v. City of Duluth,* 155 N.W.2d 281. There the Council of Duluth, in the exercise of its delegated pow-

ers, found a referendum petition invalid and repealed and reenacted the challenged ordinances, not with the intent to eliminate a referendum but with the intent to allow the objectors the opportunity by a proper referendum petition to submit the law to the electorate. The Court held that the later ordinance was valid and lawful.

We hold that Bill 1 died when it was vetoed, and that Bill 2 became law 45 days after the end of the legislative session at which it was passed.

> *Decree affirmed in part and reversed in part, and case remanded for passage of a decree expressing the views herein, costs to be paid by appellant.*