699 A.2d 434

**WESLEY CHAPEL BLUEMOUNT ASSOCIATION et al.**

v.

**BALTIMORE COUNTY, Maryland.**

**No. 90, Sept. Term, 1996.**

Court of Appeals of Maryland.

Sept. 5, 1997.

Eldridge, J., dissented and filed opinion.

J. Carroll Holzer (Holzer and Lee, on the brief), Towson, for Petitioner.

Douglas N. Silber, Assistant County Attorney (Virginia W. Barnhart, County Attorney, on brief), Towson, for Respondent.

James J. Doyle, Jr., Mary R. Craig (Doyle & Craig, P.A., all on brief), Baltimore, for amicus curiae, Maryland, Delaware, D.C. Press Association.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

The question before us in this appeal is whether the Baltimore County Board of Appeals was required by the State Open Meetings Act to deliberate in open session when considering an appeal from a hearing officer's approval of a development plan. An ancillary question, which the record does not permit us to resolve, is whether, upon a finding by the Circuit Court for Baltimore County that the board was so required and violated the law in not conducting its deliberation openly, the court was justified in requiring the county to pay 65% of the attorney's fees incurred by the persons challenging the board's action. We shall hold that the State Open Meetings Act applies to the consideration of development plans and thus required the board to deliberate in open session, and we shall therefore reverse a contrary judgment of the Court of Special Appeals. Because the circuit court omitted to make certain findings, however, the case will have to be remanded for further proceedings in that court with respect to whether (1) the violation justifies vacating the board's order, and (2) it justifies the award of attorney's fees.

This case is governed by four sections of the State Open Meetings Act, codified as Maryland Code (1995 Repl.Vol.), §§ 10–501 through 10–512 of the State Government Article. Section 10–501 recites the legislative policy behind the Act. It begins by declaring essential to the maintenance of a democratic society that, except in special and appropriate circumstances, public business be performed in an open and public manner and that citizens be allowed to observe the performance of public officials and the deliberations that go into the making of public policy. It then expresses the truism that the

ability of the public to attend and report on meetings of public bodies and to witness their deliberations ensures the accountability of government and increases the faith of the public in government. That legislative policy undergirds and pervades the Act and necessarily sets the general direction for its interpretation.

Section 10–505 states, simply and directly, that, except as otherwise provided in the Act, "a public body shall meet in open session." Two sections of the Act provide "otherwise." Section 10–508(a) lists 14 circumstances in which a public body may meet in closed session; none of them apply in this case. Section 10–503, which defines the "scope" of the Act, provides, in subsection (a), that the Act does not apply when the public body is carrying out an executive, judicial, or quasi-judicial function or to a chance encounter, social gathering, or other occasion that is not intended to circumvent the Act. Section 10–503(b), however, states that the Act *does* apply to a public body when it is meeting to consider "(1) granting a license or permit; or (2) a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter." The first, and principal, issue before us is whether consideration of a development plan constitutes "any other zoning matter" and thus falls within the ambit of subsection (b)(2).[1]

That issue, and the ancillary one regarding the assessment of counsel fees, also invoke § 10–510, which provides for enforcement of the Act. Section 10–510(b) allows a person adversely affected by an alleged violation of the Act to file a petition in the circuit court to determine the applicability of the Act, to require the public body to comply with the Act, and to void an action of the public body taken in violation of the Act. Section 10–510(d) permits the court to issue an injunction and determine the applicability of the Act but allows it to void

---

1. Petitioners never raised the issue in this Court of whether consideration of a development plan could also involve the "enforcement of any zoning law or regulation," and we shall therefore not address that issue.

the action complained of only if it finds that the public body "willfully failed to comply" with the Act and that no other remedy is adequate. § 10–503(d)(4). As part of its judgment, whatever it may be, the court is permitted under § 10–510(d)(5) to assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred and to require a reasonable bond to ensure payment of the assessment. Section 10–510(d)(5) does not, on its face, require a finding of willfulness as a precondition to the assessment of counsel fees and litigation expenses.

## BACKGROUND

Governmental control over land development is effected principally in three ways—through the adoption of (1) master plans delineating the desired uses for all land within the planning area, both for development and for roads, parks, schools, and other public purposes, (2) zoning regulations designed to implement the master plans by placing legal restrictions on the use of the land by non-governmental persons and entities, and (3) subdivision and other development regulations designed to ensure that private development of the land is consistent with the applicable master plan and zoning regulations. Although each of these devices has an independent purpose and may be subjected to a separate development and approval procedure, their functions, to some extent, coalesce, in that they are all designed to assure that land development occurs in a manner that is consistent with overall legislative policy and community welfare. Thus it is that zoning decisions take into account the provisions of the applicable master plan and subdivision and development approvals take into account compliance with applicable zoning regulations. *See Board of County Comm'rs v. Gaster*, 285 Md. 233, 401 A.2d 666 (1979).

These devices are provided for by both State and Baltimore County law. Maryland Code (1957, 1995 Repl.Vol.), Article 66B, §§ 3.01 through 3.09 authorize the non-chartered counties to create and appoint planning commissions to develop, for consideration by the county legislative body, a plan to "serve

as a guide to public and private actions and decisions to insure the development of public and private property in appropriate relationships . . . ." § 3.05(a).[2] That same authority is granted to Baltimore County by §§ 522, 522.1, and 523 of the County Charter which, respectively, create a planning board and provide for the development of a master plan, for submission to the County Council, setting forth "comprehensive objectives, policies and standards to serve as a guide for the development of the county." § 523(a). Further implementation of the planning function is provided for in § 26–81 of the County Code, which directs the county planning board to prepare a master plan for the physical development of the county and specifies the matters that may be included in the plan.

Sections 4.01 through 4.09 of Article 66B empower the non-chartered counties to develop and, by ordinance, adopt zoning regulations that, among other things, may establish zoning districts and regulate the use of land and structures within those districts. *See* § 4.02. Section 4.03 requires that the zoning regulations "shall be made in accordance with the plan." That general authority is granted to chartered counties by the Express Powers Act (Maryland Code (1957, 1996 Repl.Vol.), § 5(X) of Article 25A). It is implemented in Baltimore County by §§ 522 through 524 of the county charter, which provide for an office of planning and zoning, a director of that office, and zoning commissioners, and by §§ 26–116 through 26–135 of the County Code, which, among other things, provide for zoning districts and for the development and adoption of zoning regulations and maps.

Sections 5.01 through 5.08 of Article 66B, and, in particular, §§ 5.03 and 5.04, provide for the adoption of subdivision regulations by the non-chartered counties and, upon the adoption of those regulations, for the approval of subdivision plats by the planning commission before the plats may be recorded. Similar authority is granted to Baltimore County by

---

**2.** Section 7.03 makes most of Article 66B inapplicable to the chartered counties, of which Baltimore County is one.

§ 522.1(a)(3) of the County Charter and is implemented by §§ 26–166 through 26–283 of the County Code. Sections 26–166 and 26–167 set forth the purpose and functions of the development regulations; both sections make clear that development must conform to the master plan.

This case involves the third of the three devices—the approval of a development, or subdivision, plan.[3] It had its origin in a "concept plan" filed by Gaylord Brooks Realty Company (Gaylord) in June, 1993. In that concept plan, Gaylord proposed to build 34 single-family dwellings on 172.7 acres of land in northern Baltimore County. Nearly all of that land was zoned RC–4, a resource conservation zone designated for watershed protection. No change in that zoning was requested. The property was completely wooded and had streams and wetlands running through it. Gaylord proposed to cluster the development by building the homes on 51 acres, comprising 30% of the tract, and leaving the remaining 120 acres—70% of the tract—as a conservancy area.

The procedure for reviewing and approving development plans in Baltimore County is set forth in §§ 26–201 through 26–283 of the Baltimore County Code. As a first step, before preparing the concept plan, the applicant is urged to meet privately with county agencies to obtain information about their policies and standards that might affect the property and with the Department of Permits and Development Management (DPDM) to discuss concept plan requirements. § 26–202. The concept plan must set forth "an informative conceptual and schematic representation of the proposed development in a simple, clear and legible manner" and contain the other information required by § 26–202(c)(1) and (d). The second step is for the applicant to file the concept plan with DPDM, which transmits copies to various county agencies. Within 10 days, DPDM holds a concept plan conference with the applicant and the county agencies (1) to receive comments from the

---

**3.** The terms "development plan" and "subdivision plan" are sometimes used interchangeably, as most development plans not only entail a subdivision of the affected tract but hinge on that subdivision.

agencies, (2) to determine whether there is any conflict between the concept plan and the master plan, and (3) to identify the persons to be invited to a community input meeting. If a conflict between the concept and master plans is identified, a copy of the concept plan is sent to the planning board. Otherwise, within 10 days, the property is posted and a community input meeting is scheduled. The community input meeting is a required step, to allow the applicant to present and explain the concept plan, to allow the invited citizens to make comments, and to give the county agencies an opportunity to respond to comments. Any comments or proposed conditions not resolved at this meeting must be addressed by the appropriate county agency as part of its development plan review.

This preliminary process was completed by Gaylord. A concept plan conference was held on June 21, 1993, and community input meetings were conducted in August and October, 1993.

Within 12 months after the final community input meeting, the applicant may file a development plan with the county Department of Public Works. That plan is far more specific than the concept plan and must contain the detailed information required by § 26–203. The plan is first reviewed by the Department of Public Works for conformance to the concept plan presented at the community input meeting and for compliance with § 26–203. If approved by the Department in those respects, it is forwarded to other county agencies for comment, and a hearing is scheduled before a DPDM hearing officer. § 26–204. Prior to that hearing, a public development plan conference is held, at which the Director of Zoning Administration and Development Management attempts to resolve any conflict in agency comments and any remaining unresolved comments raised or conditions proposed at the earlier community input meeting. All comments must be submitted to the hearing officer at least five days before the hearing and remain available for public inspection. § 26–205.

After the hearing, which is recorded, the hearing officer must resolve all open comments and proposed conditions and render a final decision within 15 days. If the development plan requires a special exception, variance, special hearing, or interpretation of the zoning regulations, the applicant may combine the public hearing on the development plan with any hearing required by § 26–127 with respect to those zoning issues.[4] § 26–206.1. The hearing on Gaylord's development plan lasted three days, between June 7 and June 13, 1994. Petitioners attended the hearing to oppose the plan. Through 24 witnesses and 20 exhibits, they challenged whether the 70% conservancy area was large enough to protect the environmental features of the property and raised concerns over reduced density and lot reduction, the safety of roads, the health and environmental impact on surrounding properties from septic and well location, stormwater management, and compatibility with neighboring property. Gaylord presented five witnesses and 20 exhibits. The hearing officer apparently agreed with some of petitioners' concerns, for we are apprised in their brief that he required certain modifications and attached certain conditions to Gaylord's development. In the end, however, he approved the plan, on July 7, 1994.

Section 26–209 permits any person aggrieved by a final action on a development plan to appeal to the county Board of Appeals. Petitioners filed a timely appeal, raising 13 issues, some legal, others factual in nature. Much of their argument was based on conditions and criteria established for R.C.4 zones in a 1992 zoning ordinance (Bill No. 113–92). Among other things, that ordinance declared that, in such a zone, a "minimum" of 70% of the acreage of the tract must be designated a conservancy zone; petitioners argued that, in this case, 70% was not adequate and that the hearing officer failed to consider evidence on that issue. The ordinance also provided that each lot in a rural cluster development must

---

4. Section 26–127 requires the Zoning Commissioner to hold a public hearing on applications for variances and special exceptions if a formal request for such a hearing is filed. That section does not require a hearing on requests for interpretations of the zoning law.

contain its own private water and sewage system and that, if the Director of Environmental Protection and Resource Management finds that a lot cannot support a proposed dwelling unit without endangering potable water supply or metropolitan district reservoirs, or creating a health or environmental nuisance for neighboring properties, a dwelling unit is not allowed on that lot. Petitioners argued that an appropriate determination had not been made by the director or reviewed by the hearing officer and that septic and well locations would create a health and environmental problem for the neighborhood. They also contended that the hearing officer erred in determining that the development plan complied with the spirit and intent of the zoning classification and that it met all of the county regulations for development.

Section 26–209(c) requires the board to conduct a proceeding by hearing oral argument and receiving written briefs. At its discretion, the board may receive additional evidence. Section 26–209(f) requires the hearing to be conducted "in accordance with the county board of appeals rules of practice and procedure."[5] At the outset, petitioners requested that the board (1) conduct a *de novo* hearing, and (2) conduct its *deliberations* in public, as, in their view, required by the Open Meetings Act. Both of those requests were denied. On August 31, 1994, the board heard argument from counsel in open session and then ended the hearing. On September 15, 1994, it rendered a written opinion discussing the issues raised by petitioners and affirming the decision of the hearing officer. With respect to the Open Meetings Act, the board stated:

> "The appeal that is being heard by the Board is a development plan appeal which was before the Hearing Officer and not the Zoning Commissioner for Baltimore County. No zoning petitions (i.e., special exceptions, variances, special hearings) were filed with the development plan; hence,

---

**5.** Section 603 of the County Charter authorizes the Board of Appeals to adopt rules of practice and procedure to govern the conduct of its proceedings, those rules being subject to approval by the County Council.

there is no zoning matter before the Board in these proceedings. This Board has previously ruled that appeals of development plans to this Board are not subject to the open meetings law unless they involve 'other zoning matters.' It is pointed out that an open hearing was conducted on the record before this Board with regard to the appeal filed in this matter; however, this Board concludes that Section 10–503(b) does not apply as to the deliberation process since the Board is hearing a development plan appeal as opposed to a zoning matter appeal." [6]

Aggrieved by both the board's affirmance of the hearing officer's approval and its denial of their request that the board's deliberations be conducted in open session, petitioners filed two actions in the Circuit Court for Baltimore County—a petition for judicial review of the board's decision affirming the hearing officer's approval and a petition under State Government Article, § 10–510 to enforce the Open Meetings Act. In the latter petition, petitioners claimed that, in light of a prior circuit court decision in another case finding that the Act applied to the Board of Appeals, the decision of the board to conduct its deliberations in private constituted a willful violation of the Act. They asked that the court determine that the Act applied and that notice and open deliberations were required, that the board's action approving the development plan be voided, and that petitioners be awarded attorney's fees. Petitioners' request that the two actions be consolidated was granted, following which Gaylord was allowed to intervene as an interested party.

The Open Meetings Act issue was presented to the court on cross-motions for summary judgment. The county's position was, and remains, that, under § 10–503(b)(2), the board is required to deliberate in public session only if the matter before it falls within one of the specific categories listed in that

---

6. There was never any question about conducting the oral argument part of the hearing in open session, as that much is required by county law. Section 603 of the County Charter provides that "[a]ll hearings held by the board ... shall be open to the public."

subsection or is an "other zoning matter" and that a development plan neither comes within any of the listed categories nor constitutes a "zoning" matter. Petitioners urged that, as a development plan cannot be approved unless it conforms with applicable zoning requirements, every such plan constitutes a "zoning" matter, whether or not there is joined with it a request falling within one of the specific categories. Ultimately, the court agreed with petitioners' view and concluded that the board was required to deliberate in open session. On June 21, 1995, it entered an order granting petitioners' motion for summary judgment, remanding the case to the board for further proceedings (thereby, we presume, tacitly voiding the board's decision) and requiring the county to pay $2,387, constituting 65% of petitioners' counsel fees incurred in bringing the action to enforce the Act. In light of the remand based on the Open Meetings Act violation, the court found it unnecessary to address the other issues presented in the petition for judicial review. Unfortunately, as we shall see, the court did not make the findings necessary under the Act to justify voiding the board's decision and did not indicate precisely what the Board of Appeals was to do when the case was remanded.

The Court of Special Appeals reversed on the ground that review of a development plan is not a "zoning matter" within the meaning of § 10–503(b)(2) and, for that reason, the board was not required to conduct its deliberations in open session. *Baltimore v. Wesley Chapel,* 110 Md.App. 585, 678 A.2d 100 (1996). The appellate court determined that planning, zoning, and subdivision or development control were separate and distinct areas of regulation and that one ordinarily did not include the other. The court traced some of the legislative history of § 10–503(b)(2), in particular the 1991 law that enacted the section as it currently reads. Noting that, as initially proposed in the 1991 bill, the section would have applied to a public body when making "a land use decision" and that it was later rewritten to apply only to zoning matters, the court determined that the General Assembly intended a more limited scope.

## DISCUSSION

Section 10–503(b)(2), on its face, is ambiguous as to whether "other zoning matter" includes review of a development plan. As the Court of Special Appeals pointed out, commentators and courts, including this Court, have drawn distinctions between the planning, zoning, and subdivision or development control functions and processes. *See Board of County Comm'rs v. Gaster, supra,* 285 Md. 233, 401 A.2d 666; *Board v. Stephans,* 286 Md. 384, 408 A.2d 1017 (1979); *Clarke v. County Comm'rs,* 270 Md. 343, 311 A.2d 417 (1973). It is by no means pellucid, from just reading the statute, that consideration of a development plan constitutes a "zoning matter." Given the close connection between the planning, zoning, and development regulation functions, however, and the fact that compliance with applicable zoning regulations is a prerequisite for approval of a development plan, it is also not clear at a glance that consideration of a development plan does not constitute a "zoning matter" for purposes of § 10–503(b)(2).

■■■ As we have said many, many times, the cardinal rule of statutory construction is to ascertain and carry out the true intention of the Legislature. *C.S. v. P.G. County Dept. of Social Services,* 343 Md. 14, 24, 680 A.2d 470, 475 (1996); *City of Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757, 760 (1995). Especially when, as in this case, the words of the statute are susceptible to more than one meaning, it is necessary to consider their meaning and effect "in light of the setting, the objectives and [the] purpose of the enactment." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730, 732 (1986); *see also Fraternal Order of Police v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052, 1062 (1996) (quoting *Tucker* ). One principal way to do that is to examine the relevant legislative history of the statute.

Although there were a variety of open meetings laws in effect earlier, the first comprehensive legislation in this regard came in 1977, with the enactment of new §§ 7 through 15 of Article 76A of the Maryland Code. The 1977 Act applied to each "public body," a defined term, but only when the public

body was exercising a legislative, quasi-legislative, or advisory function. By express provision, the Act did not apply when the public body was exercising an executive, judicial, or quasi-judicial function. *See* § 9 of former Article 76A. The heart of the Act was in §§ 10 and 11. Section 11 listed 13 circumstances under which a public body otherwise subject to the Act could meet in closed session. Section 10 specified that, unless the public body was acting under § 11, its meetings had to be open to the public. Sections 12 and 13 required, respectively, that the public body give reasonable advance notice of its public meetings and that it keep minutes of all of its meetings, whether open or closed. In 1984, as part of the ongoing Code Revision process, the provisions of Article 76A were recodified, without substantive change, as §§ 10–501 through 10–510 of the State Government Article.

The exemption in the 1977 law for quasi-judicial functions served, in effect, to permit zoning boards, boards of appeals, and other administrative agencies to continue deliberating in closed session with respect to contested case hearings. In point of fact, the Act drew no generic distinction between the information-gathering and the deliberative aspects of a proceeding; whether a public body was required to meet in public depended on the nature of the function it was performing (whether it was advisory or quasi-judicial, for example) and the matter before it, not necessarily whether the body was gathering evidence, listening to presentations, or deliberating as to a decision. In our first look at the Act, in *City of New Carrollton v. Rogers,* 287 Md. 56, 410 A.2d 1070 (1980), we observed that, to the extent the Act applied, it was "the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business." *Id.* at 72, 410 A.2d at 1079.[7] We noted that, although the Act did

---

7. This was a departure, based on the breadth of the statute, from a position taken earlier by this Court with respect to a more limited open meetings law. In *Sullivan v. Northwest Garage, Inc.,* 223 Md. 544, 165

not afford the public any right to participate in the meetings, "it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings." *Id.*

By 1990, liberal exercise of the broad exemption for public bodies exercising quasi-judicial functions, initially provided for in § 9 of Article 76A (then set forth in § 10–505 of the State Government Article) and some of the categorical exclusions initially provided for in § 11 (recodified as § 10–508 of the State Government Article) had produced demands for an expansion of the law and a limitation of the exceptions to it. In response to those demands and at the apparent behest of the news media, Senate Bill 620 was introduced into the 1990 session of the General Assembly. That bill would have repealed the exemptions for executive, judicial, and quasi-judicial functions, eliminated or limited some of the categorical exceptions to the open meeting requirement, and directed that, unless one of the narrower exceptions applied, public bodies must meet in open session. It also would have allowed meetings of public bodies to be videotaped, televised, broadcast, or otherwise recorded. Two letters of opposition, which are of some interest, appear in the legislative files. One, from the Maryland Association of Counties, expressed concern over a number of provisions in the bill, including removal of the exemption for quasi-judicial functions, as to which the Association made the rather extraordinary complaint that "requiring Quasi–Judicial bodies, such as a board or commission, to conduct a contested case *hearing* in public and in front of the parties to the case may have a chilling effect in those delibera-

---

A.2d 881 (1960), we construed a Baltimore City ordinance requiring that the Board of Municipal and Zoning Appeals conduct public "meetings" as applying only to "hearings" conducted by the Board. We said, at 550, 165 A.2d at 884, that "the hearings of the Board must be public but that the deliberations of the Board after the hearing is completed may be in private." As noted earlier, § 603 of the Baltimore County Charter draws that same distinction with respect to the County Board of Appeals, requiring that only "hearings" be conducted in public.

tions." (Emphasis added.) [8] The chairman of the Board of Zoning Appeals of the City of Hagerstown sought an amendment that would have allowed "deliberative sessions" of a zoning board to be conducted in private. He expressed the view that the function of a zoning board was "not an exercise of representative government" but merely a "weighing of evidence in determining whether to grant relief ... from zoning requirements." He added that "[n]o discernible purpose may be served by public presence in such a proceeding," especially as the public had no right to participate in the deliberations.

Senate Bill 620 did not pass; it was, instead, referred by the Senate Economic and Environmental Affairs Committee for interim study by an Open Meetings Law Subcommittee of the Committee. That subcommittee held two work sessions during the summer of 1990, at which it considered a variety of issues, including whether to continue the exemption for executive, judicial, and quasi-judicial functions and whether to modify the categorical circumstances justifying a closed session. [9] One suggestion offered by the State Department of General Services was that public bodies continue to be allowed to discuss real estate acquisitions in closed session and that the existing exception covering that circumstance be expanded to include discussion of other procurement. The product of the subcommittee's deliberations was Senate Bill 170, sponsored by the Chairman of the Economic and Environmental Affairs Committee and introduced into the 1991 session.

Senate Bill 170 proposed sweeping changes in the Open Meetings Law, mostly directed at requiring more open meet-

---

8. It is not clear from the sentence, taken as a whole, whether the Association really was objecting to conducting hearings in public or only to requiring the agency to deliberate in open session.

9. The two categorical exceptions that seemed to draw the most fire were those allowing personnel decisions to be made in closed session and a "catchall" provision allowing a public body to close a session for "an exceptional reason" that two-thirds of the members of the public body found "so compelling that the reason overrides the general public policy in favor of open sessions."

ings by limiting the circumstances under which public bodies could meet in closed session. Unlike the 1990 bill, this one retained generally the broad exemption for executive, judicial, and quasi-judicial functions but, through new language, narrowed that exemption with respect to certain kinds of matters. In its initial form, the bill specified that, notwithstanding that a public body is exercising one of those functions, the Act would apply when the public body is "granting a license or permit or making a land use decision."

That language provoked considerable opposition, principally from or on behalf of county and municipal governments. Although articulation of the opposition varied somewhat, essentially three concerns were raised. The first, and most general, one was directed at requiring deliberations on the part of any quasi-judicial agency on any matter to be conducted in public, the argument being that such a requirement would chill free and honest debate. A second, somewhat more specific, complaint was made with respect to deliberating zoning decisions in particular. Finally, several groups expressed concern that the term "land use decision" might encompass such things as the acquisition of property or the location of businesses within a county. Closed sessions as to those matters were permitted under the 1977 law and under Senate Bill 170, and the groups opposed any change in that approach. The Maryland Municipal League suggested an amendment to strike the proposed language and limit application of the Act to a public body "when it is hearing testimony regarding the granting of a license or permit or a request for a change of zoning classification." That amendment would have allowed public bodies to deliberate in private with respect to all quasi-judicial matters before them and, indeed, would have permitted closed information-gathering sessions except in license, permit, and zoning reclassification cases. The League likened quasi-judicial bodies, when deliberating, to juries. It asserted that, during such deliberations, frank interchange was essential and that there should be no requirement that the deliberations of any quasi-judicial body be held in open session. It complained also that many quasi-judicial

bodies did not decide contested cases immediately after the hearing but deliberated later, often informally by telephone, that the members of many public bodies served without compensation, and that placing the deliberative function within the ambit of the Act, thereby forcing the members to return for another public session, would place an unjustified burden on them and compromise the functioning of public bodies. Finally, it urged that the term "land use decisions" was vague and that "request for a change of zoning classification" would provide "the necessary clarity."

Similar views were expressed by the Mayor of Baltimore, the Baltimore County Board of Appeals, and the Howard County Council. A letter from the Mayor's legislative liaison suggested that the provision dealing with licenses, permits, and land use decisions be amended to apply only to the portion of the meeting devoted to public testimony. The same view was taken by the Howard County Council, which urged that quasi-judicial bodies be permitted "to deliberate on a contested case involving permits, licenses and land use decisions in closed session." The Baltimore County Board of Appeals analogized its deliberations to those of an appellate court. Requiring those deliberations to be conducted in public, it said, would "chill debate and render the decision-making process a sham." None of these opponents, in presenting this broad objection, drew any distinction between zoning, development plans, other land use matters, licenses, or permits, but contended that the decision-making process generally would be jeopardized if required to be conducted in public.

The more focused concerns tended to overlap somewhat and hinged on the term "land use decision." The Maryland Association of Counties complained that the term was "subject to several interpretations, including zoning, land acquisition, and proposed use of county-owned property," and, if so construed, the provision "could conflict with exceptions to the law granted to discuss acquisition of real property or the locating of a business or industry in the county." Apart from that, the Association expressed particular opposition to conducting deliberations on zoning matters in public. Similar concern di-

rected specifically to zoning matters was expressed by the State Board of Airport Zoning Appeals. Noting that its function was to consider requests for variances from airport zoning regulations, mostly by property owners wishing to construct residential or commercial structures within the noise zone surrounding Baltimore/Washington International Airport, it complained that, if it were required to conduct its deliberations in public, there would be a chilling effect on free and frank discussion. It suggested either deleting the proposed language entirely or exempting deliberations following a contested case hearing. Finally, the Public School Superintendents' Association of Maryland noted a concern over the section requiring that public bodies keep and make public minutes of closed sessions, to the extent that it would disclose actions taken "regarding land acquisition matters."

There was, of course, a great deal of support for the bill as well, principally from the news media and organizations such as Common Cause. The Economic and Environmental Affairs Committee, and ultimately the Legislature as a whole, rejected both the broad attack on requiring any deliberations to be conducted in public and the narrower objection to requiring deliberations on zoning matters to be conducted in open session [10] but did address some of the concerns expressed over the vagueness of the term "land use decision." The Committee struck the term "land use decision" and inserted in its place the current language—"special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter." Unfortunately, there is nothing in the legislative history to indicate the origin of that language. We know only that it was adopted by the Committee and remained intact throughout the rest of the legislative process.

---

**10.** An amendment proposed on the Senate floor to add the language suggested by the Maryland Municipal League—*i.e.*, to limit the open meeting requirement, in a quasi-judicial proceeding, to when the public body is "hearing testimony regarding the granting of a license or permit, or a request for a change of zoning classification"—was defeated by a vote of 11 to 31.

The county, stressing the distinctions that have historically been made between the planning, zoning, and development regulation functions, insists that we give the phrase "other zoning matter" a narrow construction, in line with those distinctions. Approval of a development plan does not constitute zoning, it urges. Gaylord already had the required zoning; it needed no reclassification, variance, conditional use, or special exception and sought none. Ergo, what was before the board was not a "zoning matter." That, indeed, was the view of the Court of Special Appeals as well. As we observed in another context in *Clarke v. County Comm'rs, supra*, 270 Md. at 347, 311 A.2d at 420, however, "the answer here does not lie in distinguishing between those two functions in the abstract" but turns on what the Legislature intended.

■ There can be little doubt, and the county concedes the point, that, had the "land use decision" language remained in the bill, it would have sufficed to cover an appeal from the approval (or disapproval) of a development plan. The drafters of Senate Bill 170 clearly intended that the deliberative process on matters concerning land use be conducted in open meetings. It is telling, we think, that none of the opposition to the "land use decision" language sought to draw any distinction between pure zoning cases—variances, special exceptions, conditional uses, reclassifications, and the like—and development or subdivision plan cases. As noted, the counties and municipalities objected, first, to requiring open deliberations in any contested case, second, to requiring open deliberations in any contested land use case, and, third, to open deliberations in any contested zoning case. No one complained of requiring open deliberations in development plan approval cases. Indeed, the only focused concern raised about the phrase "land use decision" was whether it might include proposals for land *acquisition*, either by the government or by a business entity seeking to locate within the county. There is no evidence— none whatever—that the technical distinctions the courts had drawn between land use planning, zoning, and development control ever were considered by the Legislature or played any part in the development of the statutory language.

Neither the cases relied upon by the Court of Special Appeals nor the ultimate statutory language itself supports the county's view that development plan consideration is shielded from public view. It is true that those cases drew the distinctions noted, but the distinctions were drawn in very different contexts, having nothing to do with open meetings. ln *Clarke v. County Comm'rs, supra,* 270 Md. 343, 311 A.2d 417, for example, the issue was whether approval of a residential subdivision plan by the county planning and zoning commission with respect to land in an agricultural zone actually constituted a zoning reclassification, which could be done only by the county commissioners. The argument was made that a residential subdivision was not allowed in an agricultural zone. We held that such a subdivision was permitted in the agricultural zone, that the subdivision approval therefore did not constituting a rezoning, and that the approval, accordingly, was within the authority of the planning and zoning commission. In *Board v. Stephans, supra,* 286 Md. 384, 408 A.2d 1017, the issue was whether a statute allowing judicial review of a "zoning action" by a local legislative body allowed review of the adoption of a zoning text amendment or a comprehensive "mini" plan. After reviewing the legislative history of the statute, much as we have done here, we concluded that, notwithstanding the facially broad term, the Legislature meant it to cover only zoning reclassifications. The critical word in that case was not "zoning," but "action." In *Howard County v. Dorsey,* 292 Md. 351, 438 A.2d 1339 (1982), we held, in relevant part, that to justify a zoning reclassification based on a "mistake," the mistake had to be in the comprehensive rezoning, not in a master plan.

These cases, and others in which the separate functions of planning, zoning, and development control have been discussed, have to be viewed in context. The fact that planning, zoning, and development regulation are separate processes, sometimes committed to the jurisdiction of different agencies, often will have significance, depending on the issue before the court. The issue here is whether, in revising the Open Meetings Act to let in more sunshine, the General Assembly

intended to keep consideration of development plans in the dark. The legislative history establishes no such intent. Nor does use of the phrase "other zoning matter" require that result. Although a development plan does not always or necessarily involve a variance, special exception, conditional use, or reclassification, it may. As we have indicated, the County Code allows those kinds of zoning matters to be joined with a request for development plan approval, and we were informed at oral argument that, in such a case, the Board of Appeals conducts its deliberations on all matters before it, including the development plan, in public.[11] Beyond that, a development plan cannot be approved unless it is in compliance with applicable zoning regulations and conditions, and when compliance is challenged, as it was here, zoning issues are necessarily involved. In complaining about the adequacy of the conservancy area, the number of lots, and the adequacy of the proposed private sewage systems, petitioners were invoking and relying on provisions set forth in a *zoning* ordinance. Their argument was that this development plan did not conform to some of the requirements in that ordinance or that procedures required by that ordinance had not been followed.

To construe the term "other zoning matter," as used in § 10–503(b)(2), in the narrow fashion adopted by the Court of Special Appeals would be to render it almost meaningless. Section 10–503(b)(2) has application only when the public body is carrying out an executive, judicial, or quasi-judicial function. If it is carrying out some other function—presumably a legislative, quasi-legislative, or advisory function—it must meet in open session in any event, unless allowed to close the session pursuant to § 10–508. That would take care of zoning text

---

11. We can find no basis for construing the statute as requiring public deliberations on a development plan only when accompanied by an incidental request for variance, special exception, reclassification, or conditional use. There is nothing in the statutory language or in the legislative history to justify such a distinction. Perhaps the board concluded that, if it is required to deliberate publicly on some other matter, it will, as a matter of grace, allow the public to observe its deliberations on the development plan as well.

and map amendments and other reclassifications that are legislative in nature. When considering § 10–503, the attention of the General Assembly was focused most particularly on administrative agencies, like zoning commissions and boards of appeals. The Legislature made clear, by specific enumeration, that those agencies were to deliberate in open session when considering special exceptions, variances, conditional uses, zoning classifications, and enforcement—the kinds of pure zoning matters most often coming before them in an executive or quasi-judicial context.[12] Yet, by adding the catch-all "other zoning matter," it obviously intended to require open sessions in other matters as well.

 The Court of Special Appeals applied the doctrine of *ejusdem generis* in limiting the scope of the catchall term. As we made clear in *In re Wallace W.*, 333 Md. 186, 193, 634 A.2d 53, 57 (1993), however, quoting in part from *Blake v. State*, 210 Md. 459, 462, 124 A.2d 273, 274 (1956), that doctrine "should not be invoked where it would 'subvert [the statute's] obvious purpose.'" Adopting the premise set forth in 2A Sutherland Stat. Const. § 47.22, at 210, we explained that "'the general words will not be restricted in meaning if upon a consideration of the context and the purpose of the particular statutory provisions as a whole it is clear that the general words were not used in the restrictive sense.'" *Id.* at 193, 634 A.2d at 57. That is certainly the case here. If the Legislature did not intend to include within the ambit of the catchall term other land use matters likely to come before the agency that did not fall within one of the enumerated areas but nonetheless had some nexus to zoning, the catchall would have no effect, and

---

12. Notwithstanding the view expressed by the county in its brief, those kinds of agencies cannot, of course, exercise a judicial function. Although the separation of powers provisions of Article 8 of the Maryland Declaration of Rights have been held inapplicable to local government (*see Wicomico County v. Todd*, 256 Md. 459, 260 A.2d 328 (1970); *Pressman v. D'Alesandro*, 193 Md. 672, 69 A.2d 453 (1949)), the purported vesting of judicial power in any Executive branch agency, State or local, would contravene Article IV, § 1 of the Maryland Constitution, which vests the judicial power of the State in the enumerated courts.

therefore no purpose.[13] Statutes are not to be construed in that manner; to the contrary, statutes are to be read "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Montgomery County v. Buckman,* 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994) (citations omitted).

When viewed in this way, it seems clear that the review of development plans, which have a very close nexus to zoning, constitutes a kind of "other zoning matter" intended to be included within § 10–503(b)(2). That result is consistent with both the legislative history and the overall policy of the Open Meetings Act. It is also consistent with the general policy embodied in the County Code itself, which subjects development plans to community input throughout the process and, indeed, is consistent with the earlier decision of the Court of Special Appeals in *Miller v. Forty West Builders,* 62 Md.App.

---

**13.** When asked at oral argument what kinds of zoning matters, other than those enumerated in the statute, might come before the Board of Appeals, the county referred to a statement in its brief that "[t]here are other ways to change the zoning of a property which are not specified in the Act, such as historic area zoning, incentive zoning, performance zoning, spot zoning, conditional zoning, 'use it or lose it' zoning, floating zones and text amendments." When pressed whether those matters, none of which are defined by the county and some of which are not entirely clear, come before the Board of Appeals, the county acknowledged that some are determined by the county legislature, and "[s]ome of these happen in other jurisdictions that don't necessarily happen in Baltimore County, and I don't know how every county handles it." More to the point, this colloquy occurred:

"[The Court]: If there is a dispute that arises as to whether the plan is in compliance with all the zoning requirements, would the approval or disapproval of the plan then constitute an 'other zoning matter,' if the board was required to make some ruling on compliance [County Attorney]: Yes. . . . Had [petitioner] gotten before the board of appeals and said we believe the hearing officer violated the zoning ordinance, then that issue should have been handled as an open meeting on that issue. . . . If there was an allegation that the hearing officer had violated the zoning law and had in fact exercised a zoning function, then yes that would be a matter that should be raised to the board and that issue should be addressed open, publicly."

As we have seen, an argument was made before the Board that the development plan was *not* in compliance with provisions in the 1992 zoning ordinance (Bill No. 113–92).

320, 489 A.2d 76 (1985) (approval of subdivision plan under then-applicable Baltimore County development regulations "involves zoning").

■ Our conclusion that the Board of Appeals was required by § 10–503(b)(2) to conduct its deliberations in open session does not, unfortunately, end the matter. As we indicated, § 10–510, which deals with enforcement, gives the court broad injunctive power upon finding a violation of the Act, but § 10–510(d)(4) allows the court to void the public body's action only upon a finding that the public body *"willfully* failed to comply with § 10–505 . . . and that no other remedy is adequate." (Emphasis added.) The circuit court made no such findings in this case. The only relevant finding made by the court, announced from the bench, was that consideration of the development plan involved a zoning matter and that, as a result, the board was required to hold "an open hearing on [its] deliberations." The order signed by the court expressed no findings at all but simply stated that the case was "remanded to the Board of Appeals for further proceedings, not inconsistent with the reasons for the remand as stated in open Court." Assuming that the order of remand, at least tacitly, had the effect of vacating or voiding the board's decision, the order was inappropriate in the absence of the prerequisite findings.

We shall reverse the judgment of the Court of Special Appeals because it rested on a construction of law with which we disagree. We cannot direct that the judgment of the circuit court be affirmed, however, because that judgment also was inappropriate. We shall therefore direct that the Court of Special Appeals remand the case to the circuit court in order that it may consider, and make specific findings, whether the statutory conditions to voiding an action taken in violation of the Open Meetings Law are present. Although, as we have indicated, an assessment of attorney's fees under § 10–510(d)(5) does not depend on a finding of willfulness, the animus of the board, if any, would certainly be a factor to consider. We do not believe that the Legislature intended for

such assessments to be automatic upon a finding of a violation, for that would require the diversion of scarce public funds for fee-shifting purposes merely because a public body guessed wrong on the eventual outcome of a legal issue. Courts considering fee assessments need to take into account, among other things, whether, how, and when the issue of a closed session or other prospective violation was presented to the public body, the basis, if any, the public body gave for concluding that its action was permissible under the Act, whether that basis was a reasonable one under the law and the circumstances, whether the amounts claimed are reasonable, and the extent to which all parties acted in good faith. The circuit court will have an opportunity to do that and to make appropriate findings when the case is remanded to it.[14]

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR ORDER REMANDING CASE TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.

Dissenting opinion by ELDRIDGE, J.

ELDRIDGE, Judge, dissenting:

As a matter of public policy, the majority's construction of the Open Meetings Act is preferable to and more rational than the construction of the statute by Baltimore County and the Court of Special Appeals. Unfortunately, however, the majority's construction is not supported by the unambiguous lan-

---

14. It is not entirely clear that the issue of attorney's fees is before us in any event. It was raised by the county in the Court of Special Appeals, but, as that court held that there was no violation of the Act, it did not address the assessment issue. Petitioners' brief in this Court understandably addressed only the issue decided by the Court of Special Appeals. Although normally we might direct the Court of Special Appeals to consider the issue it did not reach earlier, as further findings would, in any event, be required by the circuit court, there is no reason to have further proceedings in the Court of Special Appeals.

guage of the statute, by its legislative history, or by the numerous opinions of this Court which have drawn a sharp distinction between "planning" and "zoning." The approval or disapproval of a development plan is simply not a "zoning matter." For these reasons, thoroughly discussed in Judge Hollander's excellent opinion for the Court of Special Appeals, *Baltimore County v. Wesley Chapel,* 110 Md.App. 585, 678 A.2d 100 (1996), I would affirm the judgment of the Court of Special Appeals.