62 A.3d 238

FRATERNAL ORDER OF POLICE, MONTGOMERY COUNTY LODGE 35

v.

MONTGOMERY COUNTY EXECUTIVE.

No. 0722, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 4, 2013.

118

William J. Chen, Jr., (Chen & McCabe, LLP, Rockville, MD, Margo Pave, Zwerdling, Paul, Kahn & Wolly, PC., Washington, D.C.), all on the brief, for Appellant.

Edward B. Lattner, Chief (Marc P. Hansen, County Attorney, on the brief), Rockville, MD., for Appellee.

Panel: WRIGHT, HOTTEN, JAMES R. EYLER, (Retired, Specially Assigned), JJ.

WRIGHT, J.

This appeal arises from appellee, Montgomery County Executive ("County Executive") Isiah Leggett's, failure to include sufficient funds to implement a collective bargaining agreement ("CBA") in the proposed budget for Fiscal Year 2012 ("FY12"). Appellant, the Fraternal Order of Police, Montgomery County Lodge 35 ("FOP 35"), filed a prohibited practice charge against the County Executive, accusing him of violating §§ 33–80(g) and 33–82(a)(8) of the Montgomery County Code ("MCC"), part of the Police Labor Relations Act ("PLRA"). The Permanent Umpire ("Umpire") found that the County Executive was required to include the CBA and sufficient funds to implement it in the proposed budget and that the County Executive's failure to do so constituted a prohibited practice. The County Executive filed a motion for a writ of mandamus in the Circuit Court for Montgomery County and FOP 35 filed a motion for summary judgment in response. The circuit court granted the County Executive's writ, denied FOP 35's motion, and reversed the decision of the Umpire. This timely appeal followed.

## Question Presented

FOP 35 asks us to determine the following:

Is the decision of the Permanent Umpire supported by substantial evidence of record which is fairly debatable and premised upon a correct application of law?

Finding that the circuit court erred in denying FOP 35's motion for summary judgment and reversing the decision of the Umpire, we reverse the circuit court's judgment.

## Facts and Procedural History

The facts in this case are undisputed. FOP 35 is the exclusive certified bargaining unit representative for Montgomery County police officers below the rank of lieutenant.[1] In June 2010, FOP 35 and the County Executive entered into a two-year CBA ("2011 Agreement"). In November 2010, the parties began negotiations for an amendment to the 2011 Agreement and soon came to an impasse. Upon impasse, the parties submitted the issues to an Impasse Neutral ("the Neutral"), pursuant to MCC § 33–81(c),[2] which stated in pertinent part:

(c) An impasse over a reopener matter or the effects on employees of an exercise of an employers [sic] right must be resolved under the procedures in this subsection. Any other impasse over a matter subject to collective bargaining must be resolved under the impasse procedure in subsections (a) and (b).

(1) Reopener matters.

(A) If the parties agree in a collective bargaining agreement to bargain over an identified issue on or before a specified date, the parties must bargain under those terms. Each identified issue must be designated as a "reopener matter."

(B) When the parties initiate collective bargaining under subparagraph (A), the parties must choose, by agreement or through the processes of the American

---

1. MCC § 33–76 states: *"Employee* means any police officer classified as a sergeant, master police officer I, master police officer II, police officer I, police officer II, police officer III, or police officer candidate, or an equivalent non-supervisory classification, but not a police officer in any higher classification."

2. This section was modified in December 2010 and again in October 2011. We have included the language in effect as of November 2010.

Arbitration Association, an impasse neutral who agrees to be available for impasse resolution within 30 days.

(C) If, after bargaining in good faith, the parties are unable to reach agreement on a reopener matter by the deadline specified in the collective bargaining agreement, either party may declare an impasse.

(D) If an impasse is declared under subparagraph (C), the dispute must be submitted to the impasse neutral no later than 10 days after impasse is declared.

(E) The impasse neutral must resolve the dispute under the impasse procedure in subsection (b), except that:

(i) the dates in that subsection do not apply;

(ii) each party must submit to the impasse neutral a final offer on only the reopener matter; and

(iii) the impasse neutral must select the most reasonable of the parties' final offers no later than 10 days after the impasse neutral receives the final offers.

Section 33–81(b)(5) required the Neutral to analyze the offers as follows:

(5) On or before February 1, the impasse neutral must select, as a whole, the more reasonable, in the impasse neutral's judgment, of the final offers submitted by the parties.

(A) The impasse neutral must first evaluate and give the highest priority to the ability of the County to pay for additional short-term and long-term expenditures by considering:

(i) the limits on the County's ability to raise taxes under State law and the County Charter;

(ii) the added burden on County taxpayers, if any, resulting from increases in revenues needed to fund a final offer; and

(iii) the County's ability to continue to provide the current standard of all public services.

(B) After evaluating the ability of the County to pay under subparagraph (A), the impasse neutral may only consider:

(i) the interest and welfare of County taxpayers and service recipients;

(ii) past collective bargaining contracts between the parties, including the bargaining history that led to each contract;

(iii) a comparison of wages, hours, benefits, and conditions of employment of similar employees of other public employers in the Washington Metropolitan Area and in Maryland;

(iv) a comparison of wages, hours, benefits, and conditions of employment of other Montgomery County employees; and

(v) wages, benefits, hours[,] and other working conditions of similar employees of private employers in Montgomery County[.]

The Neutral found that the final offer made by FOP 35 was the more reasonable offer. On February 18, 2011, the Neutral issued a decision, or arbitration award ("Award"). Under MCC § 33–81(b)(7), the Award then became integrated into the 2011 Agreement, resulting in the final agreement between the parties ("Final Agreement"). Section 33–81(b)(7) states:

The offer selected by the impasse neutral, integrated with the previously agreed upon items, shall be deemed to represent the final agreement between the employer and the certified representative, without the necessity of ratification by the parties, and shall have the force and effect of a contract voluntarily entered into and ratified as set forth in subsection 33–80(g) above. The parties shall execute such agreement.

In turn, section 33–80(g) states:

*Submission to Council.* A ratified agreement shall be binding on the employer and the certified representative, and shall be reduced to writing and executed by both parties. In each proposed annual operating budget, the

County Executive shall describe any collective bargaining agreement or amendment to an agreement that is scheduled to take effect in the next fiscal year and estimate the cost of implementing that agreement. Any term or condition of a collective bargaining agreement which requires an appropriation of funds or enactment, repeal or modification of a County law shall be timely submitted to the County Council by the employer by April 1, unless extenuating circumstances require a later date. If a later submission is necessary, the employer shall specify the submission date and the reasons for delay to the Council President by April 1. The employer shall make a good faith effort to have such term or condition implemented by Council action. Each submission to the Council shall include:

(1) all proposed legislation and regulations necessary to implement the collective bargaining agreement;

(2) all changes from the previous collective bargaining agreement, indicated by brackets and underlines or a similar notation system; and

(3) all side letters or other extraneous documents that are binding on the parties.

On March 15, 2011, the County Executive submitted a proposed operating budget for FY 12 ("FY 12 Budget") to the Council. The County Executive did not include the Final Agreement in the FY12 Budget, but instead submitted the final offer that he had presented to the Neutral. In response, FOP 35 filed a prohibited labor practice charge against the County Executive. In his answer to the charge, the County Executive admitted that he failed to submit the Final Agreement in the FY12 Budget but argued that his actions were permitted by Charter § 303 and, therefore, the charge should be dismissed.

On April 13, 2011, the Umpire conducted a hearing and on April 28, 2011, issued a decision. After analyzing whether Charter § 303 permitted the County Executive's actions, the Umpire's decision stated:

For all of these reasons, I find that the County Executive violated Sections 33–80(g) and 33–82(a)(8) of the PLRA by failing to request in the FY 2012 Budget Request funding necessary to implement the 2011 Agreement and the FY 2012 Award. The assertion that Section 303 of the Charter sanctioned this action is rejected. To the contrary, although I lack jurisdiction to enforce a violation of the Charter, I find that Section 303 of the Charter was violated by the County Executive's refusal to follow the directive that the FY 2012 Budget Request conform to applicable law, including specifically the PLRA.

On April 29, 2011, the County filed a petition for judicial review with the circuit court. On May 3, 2011, FOP 35 filed a motion for summary judgment and on May 6, 2011, the circuit court conducted a hearing and issued an oral ruling.

The circuit court stated that it relied on *Wicomico County v. Todd,* 256 Md. 459, 260 A.2d 328 (1970) for "a number of legal points [to] guide [its] decision." Citing the *Wicomico* case, the trial court stated, "the question of just how much power has been granted to one branch or the other is a matter of statutory construction." The court stated further that in Montgomery County, Charter § 101 "vests the legislative powers which may legitimately be exercised under the Maryland Constitution and under the laws passed by the General Assembly in the Council." The court noted that, according to the Charter, a clear separation of powers exists between the Council as the legislative branch and the County Executive as the executive branch of the county government. The court acknowledged that collective bargaining with binding arbitration is required for police officers in the Charter.

The circuit court then posited the issue in the case and made its decision as follows:

The question then becomes has the Executive in this case complied with its obligations under the Charter and has the Executive in this case complied with its obligations under the ordinances. Section 303 of the Charter requires the County Executive to submit to the Council not later than

January 15 and March 15 respectively of each year, proposed capital and operating budgets, including expenditures and revenue sources for the upcoming year. That's part 1. And part 2, and any other information in such form and detail as first the Executive thinks is appropriate and second and separately, as may be prescribed by law. I interpret that to mean as may be required by the County Council pursuant to a code provision. Conceivably although it's not really raised in this case, it may be as required by the General Assembly pursuant to a public law, but that's not this case, okay?

Then the question becomes has the Executive done that in this case? I am directed to 33–80(g) of the Police Labor Relations Act which is in the Montgomery County Code. That subsection requires in each annual operating budget, that the County Executive to first describe any collective bargaining agreement or an amendment to an agreement that is scheduled to take effect in the upcoming fiscal year, and second, to estimate for the Council the cost.

I conclude, having reviewed the parties' submission of record, that the Executive has done so in this case.

\* \* \*

The argument is made that well, that is insufficient. That a provision of the Charter, specifically 303, requires the County Executive to do more than what he's done. And that conclusion was echoed by the Permanent Umpire. I respectfully disagree, employing ordinary principles of statutory construction. . . . If I read the plain language of Section 303 of the Charter, which is captioned Capital and Operating Budgets, I conclude that the County Executive in this case has complied with his obligations under the Charter. The import, as I understand it, of the Permanent Umpire's decision is that the County Executive is required to endorse, sponsor, include as a line item in his budget of any contract under a collective bargaining agreement. Respectfully, that's not what 303 says. As a consequence, since that's not what 303 says, the County Executive is not required to do it.

In the event, however, that I am incorrect in my reading of Section 303, of Section 33–80(g), as an independent alternative ground, I respectfully conclude that to the extent that either Section 303 of the Charter or 33–80(g) of the Code were to be read to require the Executive to endorse it, under the principles of separation of powers as articulated in *Todd*, such a requirement would trench upon the authority of the Executive and would create an unnecessary conflict and be inconsistent with, in my judgment, Section 201 of the Charter, which vests in the County Executive the executive power.

To the extent that it is necessary to reach that independent alternative conclusion, which it may not be necessary to do, although strictly speaking the discussion by the Court of Appeals in *Schisler v. The State* [sic], 394 Md. 519 [907 A.2d 175 (2006)] was in respect of Article 8 of the constitution, the concepts filtered through the lens of cases such as *Todd* apply. The concerns of separation of powers in 1776, respectfully, are the same and no less than they are today. And while it may be that by Charter, with language that is sufficiently clear and unequivocal, the powers of the County Executive may be either circumscribed or the County Executive may be directed to do very specific things.

In the absence of such requisite clarity, it is my view that for me to infer that such is what either was intended by the Charter or that is now currently desired by the Council would run afoul of the separation of powers concept as articulated, although they are filtered thorough the lens of *Todd* in *Schisler v. The State*.

The concern at bottom was that one branch of government not be subservient to or trench upon the authorities of the other branches. If by Charter the people of Montgomery County want to diminish, on the one hand, or expand on the other hand the power of the executive or the legislative branch at least in theory ... they may do so. But, in my judgment, they have not done so heretofore.

By Order dated May 9, 2011, the circuit court denied FOP 35's motion for summary judgment, granted the County's

petition for judicial review, and reversed the decision of the Umpire. The decision was entered on May 12, 2011, and on June 6, 2011, FOP 35 filed this timely appeal.

## Standard of Review

FOP 35 urges us to apply the usual standard of review of administrative agency decisions. Under this standard, the appellate court's role is identical to that of the circuit court, and we review the agency, or in this case, the Umpire's decision. *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md.App. 264, 273–74, 47 A.3d 1087 (2012). As such, our review is limited to determining if the agency's factual findings are supported by substantial evidence and "no error of law exists." *Id.* The agency's legal conclusions are reviewed *de novo*. Generally, we accord some deference to the agency when it is interpreting the statutes it administers. *Md. Aviation Admin. v. Noland*, 386 Md. 556, 572, 873 A.2d 1145 (2005). However, here the ultimate issue lies not with the collective bargaining statutes themselves, but with an interpretation of the Charter and the Council's ability to limit the County Executive's budgetary discretion. Therefore, no deference is required.

The Court of Appeals reminds us, in *Balt. Cnty. Fraternal Order of Police Lodge No. 4 v. Balt. Cnty.*, 429 Md. 533, 560, 57 A.3d 425 (2012), that the standard of review in this Court "is determined by the circuit court's disposition of the matter." Quoting *Mont. Cnty. v. Fraternal Order of Police, Mont. Cnty. Lodge 35, Inc. ("FOP 35 I")*, 427 Md. 561, 571, 50 A.3d 579 (2012) (reviewing circuit court's disposition for legal error rather than reviewing arbitrator's decision). Our review is, thus, constrained to the circuit court's denial of FOP 35's motion for summary judgment.

As the *FOP 35 I* Court stated, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is . . . whether the trial court's legal conclusions were legally correct." *Id.* at 572, 50 A.3d 579 (quoting *Messing v. Bank of Am., N.A.*, 373 Md. 672, 684, 821 A.2d 22 (2003)). "We review *de novo* . . . the interpretation of a statute."

*Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142, 46 A.3d 443 (2012) (citations omitted). In sum, "where an order [of the trial court] involves an interpretation and application of Maryland constitutional, statutory[,] or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006) (citations omitted).

## Discussion

### I. Collective Bargaining Law and Montgomery County Charter

FOP 35 argues that the Umpire's decision was supported by substantial evidence and was legally correct. According to FOP 35, the Umpire properly concluded that the County Executive committed unfair labor practices under MCC §§ 33–80(g) and 33–82(a)(8) by not "provid[ing] full funding in the amounts necessary to fully implement the [Final] Agreement." FOP 35 contends that the Umpire also correctly concluded that Charter § 303 does not grant the County Executive "unlimited discretion as to what to include or not to include in the proposed Budget" and that the County Executive failed "to accord meaning to the 'and as may be prescribed by law' language in Section 303 which, on its face, includes the PLRA." FOP 35 argues that MCC § 33–80(g) is a law contemplated by Charter § 303 and that the collective bargaining laws are mandated by Charter § 510.

The County responds that the County Executive has a "virtually unchecked" discretionary legislative function in proposing a budget delegated by Charter § 303 that cannot be divested by any collective bargaining laws enacted by the County Council. The County avers that the Charter "allocates the role of recommending the operating budget to the County Executive, and not to the Council, and the Council is not authorized to impinge on the County Executive's power through enactment of a local law that, by its plain terms, conflicts with the County Executive's Charter power under

§ 303." The County also argues that a prohibited practice charge cannot arise out of the County Executive's "expression of his views," and that the County Executive "cannot be called to account before an arbitrator for an exercise of his legislative discretion."

Ultimately, the dispute involves the interpretation of the Charter and any effect the collective bargaining laws enacted by the Council has on the County Executive's responsibilities under Charter § 303. The Court of Appeals, after noting that "[t]he tension between public employee unions and local governments, particularly those bound by an executive budget system, has surfaced in Maryland appellate cases since at least [1945]," provided an extensive review of the cases arising since then in *Atkinson v. Anne Arundel Cnty.*, 428 Md. 723, 728, 53 A.3d 1184 (2012). Succinctly, the Court concluded that collective bargaining is appropriate charter material, and a county can impose binding arbitration on the executive branch.[3] Therefore, there is no need to reiterate that analysis here in response to the parties' arguments that binding arbitration cannot apply to the County Executive.

## A. The State Executive Budget System

The Montgomery County budget system is modeled in many respects on the State budget system. The State has an "executive" budget system, where the budget originates with the Governor. So too, does Montgomery County—as the County points out, "[u]nder the Charter, only the County Executive can initiate the County's budgetary process." However, where the State system limits the ability of the General Assembly to alter the budget submitted to it,[4] the Montgom-

---

3. It is important to note that in *Atkinson*, the Anne Arundel County Charter required that an arbitrator's "binding decision be implemented as part of the following year's budget process" and did not leave room for the Council to enact legislation defining the limits and applicability of arbitration, as does Charter § 510. 428 Md. at 743, 53 A.3d 1184.

4. Art. III, § 52(6) states:

ery County system gives the Council unfettered authority to alter, reduce, or increase the appropriations submitted by the Executive.[5] The similarities of the two systems, in regard to the limitations placed on the executive branch's discretion as to what must be included in the budget is instructive.

The State budget process is set forth in Art. III, § 52 of the Maryland Constitution. Section 52 was adopted, in large measure, to correct the haphazard system of appropriation that existed prior to 1915, which could easily lead to a deficit.[6]

> The General Assembly shall not amend the Budget Bill so as to affect either the obligations of the State under Section 34 of Article III of the Constitution, or the provisions made by the laws of the State for the establishment and maintenance of a system of public schools or the payment of any salaries required to be paid by the State of Maryland by the Constitution thereof; and the General Assembly may amend the bill by increasing or diminishing the items therein relating to the General Assembly, and by increasing or diminishing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein, provided, however, that the salary or compensation of any public officer shall not be decreased during his term of office; and such bill, when and as passed by both Houses, shall be a law immediately without further action by the Governor.

5. Montgomery County Charter § 305 states in pertinent part: "The Council may add to, delete from, increase or decrease any appropriation item in the operating or capital budget. The Council shall approve each budget, as amended, and appropriate the funds therefor not later than June 1 of the year in which it is submitted."

6. The old system was described thusly:

> It was customary, under the former method, for the Governor to appear in person before a joint meeting of the members of the House of Delegates and the Senate, at the beginning of every regular session of the Legislature, and to address them on "the condition of the State[,"]—in the course of which he was expected to direct their attention to the essential needs of the State, and to specifically recommend to their consideration such measures as he judged necessary. Having thus discharged the responsibility imposed upon him by the Constitution, the Governor must thereafter await the final disposition of his recommendations by the Legislature, whose members were free to adopt, alter or entirely ignore any or all of them, except in so far as the Governor, by virtue of his prestige and his

*See McKeldin v. Steedman,* 203 Md. 89, 96, 98 A.2d 561 (1953) ("Appropriations for various purposes were made piece-meal by the General Assembly, each project receiving independent consideration without relation to other claims upon the public purse."). Section 52 apportioned responsibility according to the established branches of government by vesting "sole responsibility, within the limits of the Constitution and the provisions of existing law, of presenting to the Legislature a complete and comprehensive statement of the needs and resources of the State" to the Governor. *Md. Action for Foster Children, Inc. v. State,* 279 Md. 133, 146, 367 A.2d 491 (1977) (quoting *Journal of Proceedings of the Senate of Maryland* at 133–34). The General Assembly was given authority to initiate appropriations, but was subject to the balanced budget requirement of Art. III, § 52. The underlying purpose of establishing an orderly budget system with clearly delineated responsibility was the rationale behind the Court's holding in *Foster Children,* where it stated:

> The provisions of the Budget Amendment to the Maryland Constitution, Art. III, § 52, and the purposes underlying those provisions set forth in the Goodnow Commission's report, compel the conclusion that he funding of Art. 88A,

---

influence with the members of the Legislature, might affect the course of his recommendations through the Legislature.

\* \* \*

The power to fix the fiscal policies and determine the course of the fiscal operations of the State was, therefore, exclusively vested in the Legislature, subject only to the mild restraint of the limited veto powers of the Governor, and whatever power of persuasion he might be capable of exercising with individual members of the Legislature. The old method often witnessed "log-rolling" or "you help me and I'll help you" tactics among many of the members of the Legislature in their efforts to insure passage of the particular appropriations in which they had some selfish or political interest. It was not unusual for excessive appropriations to result from such tactics and also from the pressure of political and professional lobbyists; and, almost as frequently, some of the most important activities or needs of the State were either overlooked or sadly neglected in what was commonly termed, the "Pork Barrel" scramble.

*Panitz v. Comptroller of Treasury,* 247 Md. 501, 505–506, 232 A.2d 891 (1967) (quoting Hooper S. Miles, *The Maryland Executive Budget System* 8–9 (1942)).

§ 60B(b) of the Code in future annual budgets is a matter constitutionally committed to the Governor's discretion. For a court to require that the Governor fund the foster care program administered by the Juvenile Services Administration at a particular level in future Budgets prepared and submitted by the Governor would be inconsistent with several provisions of the Budget Amendment to the Constitution.

*Id.* at 148, 367 A.2d 491.

The Court further explained: "The Legislature, by enacting statutes specifying minimum spending limits, cannot deprive the Governor of the discretion which the Constitution explicitly vests in him." *Id.* at 151, 367 A.2d 491. The Court stated that if the General Assembly could specify what was to be included in the budget and the amounts, then the executive budget system would be destroyed. *Id.* at 152, 367 A.2d 491.

Dissenting, Chief Judge Murphy stated:

To impose such a mandatory duty on the Governor is not to cause the destruction of the executive budget system, as the majority suggests. Indeed, not to impose such a duty upon the Governor has far more deadly consequences; most certainly it would herald the demise of the delicate and time-honored balance existing between the power and responsibility of the legislature to make the laws and the Governor's duty to see that they are faithfully executed. . . . Under the majority's interpretation, the Governor enjoys unbridled authority to ignore the legislative will, or even worse, to decide, in his sole discretion, which enactments will be funded and which will not.

*Id.* at 153, 367 A.2d 491. The dissent pointed to the language of Art. III, § 52(4) requiring the Governor to include appropriations "for such other purposes as are set forth in the . . . laws of the State" and argues that this provision removes the Governor's discretion to simply exclude items from the budget. *Id.* at 157, 367 A.2d 491. The dissent explains that it is not "new or novel" for the General Assembly "by enacting a general law [to] compel the Governor to include an appropria-

tion in his Budget Bill[.]" *Id.* at 158, 367 A.2d 491 (citations omitted); *see also id.* at 160–61, 367 A.2d 491 (citing the Goodnow Commission which drafted the Budget Amendment and Md.Code (1957, 1967 Repl.Vol.) Art. 15A, § 21A). Citing to amicus curiae briefs, the dissent clarified the position of the General Assembly:

> Maryland's adoption of an executive budget system has resulted in no transfer from the General Assembly of its fundamental power to declare what the law shall be, in fiscal as in other matters. At most, the adoption of such a system shifted to the Governor a role of initiation or proposal; it did not give to the executive branch any power to overrule legislative policy determinations.
>
> * * *
>
> The Governor still has the power, within the guidelines established by the General Assembly by law, to allocate the general revenues of the state among the various programs provided by law and to determine the extent to which these programs shall be funded. If in his opinion the general revenues of the state will not be sufficient, then it is incumbent upon him to make this fact known to the Legislature so that it may levy such taxes as it deems best to provide the necessary revenue.

*Id.* at 158–160, 367 A.2d 491.

The majority's holding was superceded in part by a 1978 constitutional amendment, which required the Governor to include in the annual budget bill any minimum level of funding for a program specified by statute. It is our view that, as a result, the dissent's argument has been vindicated and, as the County Executive analogizes his role to that of the Governor, this discussion is pertinent to the case *sub judice.* Further, because the question of whether the Council can permissibly constrain the County Executive's discretion in his budget submission is one of first impression, we will be guided by the State's example.

## B. History of the Montgomery County Charter

Montgomery County evolved differently than the State, with the position of the County Executive established via an amendment to the County's original Charter. Montgomery County is a "home rule" county, authorized by Article XI–A of the Maryland Constitution to adopt a county charter. The county charter functions as a "constitution" for the county. *Mont. Cnty. v. Anchor Inn Seafood Rest.*, 374 Md. 327, 331, 822 A.2d 429 (2003) (citing *Save Our Streets v. Mitchell*, 357 Md. 237, 248, 743 A.2d 748 (2000)). Article XI–A, § 3, requires "that a county adopting a home rule charter must select one of two types of government: (1) an elective legislative body known as the County Council without an elected County Executive or (2) an elective County Council plus an elective County Executive." *Id.* at 331, 822 A.2d 429 (footnote omitted); *see* Md. Const. Art. XI–A, § 3.

In 1948, Montgomery County adopted a charter. In the original charter, Montgomery County had no county executive, making the elected County Council the entire governing body with both legislative and executive powers. *Id.* at 332, 822 A.2d 429. Twenty years later, in 1968, Montgomery County adopted a new charter, effective in 1970, which, pursuant to Article XI–A, imposed separation of powers with the Council as the legislative branch and a county executive as the executive branch of the government. *Id.; see also Eggert v. Mont. Cnty. Council*, 263 Md. 243, 256–60, 282 A.2d 474 (1971) (discussing the new charter and how the Council's efforts to exercise powers now reserved to the executive branch were invalid).

The original Charter expressly prohibited the Council, when sitting in executive session from exercising legislative powers. *Scull v. Mont. Citizens League*, 249 Md. 271, 280, 239 A.2d 92 (1968). In construing the Council's powers in its respective roles, the Court in *Scull* stated that "unambiguously . . . the Council in executive session has and may exercise the administrative and executive powers . . . and may implement and facilitate and insure the proper execution of laws and ordi-

nances passed by the Council in legislative session[.]" *Id.* at 281–82, 239 A.2d 92. This same delineation of power is reflected in the new (and current) Charter.

Article 1 of the Charter describes the legislative branch of the county, with § 101 stating, in pertinent part:

All legislative powers which may be exercised by Montgomery County under the Constitution and laws of Maryland, including all law making powers heretofore exercised by the General Assembly of Maryland but transferred to the people of the County by virtue of the adoption of this Charter, and the legislative powers vested in the County Commissioners as a District Council for the Montgomery County Suburban District, shall be vested in the County Council. The legislative power shall also include, but not be limited to, the power to enact public local laws for the County and repeal or amend local laws for the County heretofore enacted by the General Assembly upon the matters covered by Article 25A, Annotated Code of Maryland, 1957, as now in force or hereafter amended, and the power to legislate for the peace, good government, health, safety or welfare of the County.

Article 2 of the Charter sets forth the executive branch powers, stating in § 201:

The executive power vested in Montgomery County by the Constitution and laws of Maryland and by this Charter shall be vested in a County Executive who shall be the chief executive officer of Montgomery County and who shall faithfully execute the laws. In such capacity, the County Executive shall be the elected executive officer mentioned in Article XI–A, Section 3 of the Constitution of Maryland. The County Executive shall have no legislative power except the power to make rules and regulations expressly delegated by a law enacted by the Council or by this Charter.

The Charter's delegation of power is critical to an analysis of the meaning of Charter § 303. Section 303 states:

The County Executive shall submit to the Council, not later than January 15 and March 15, respectively of each

year, proposed capital and operating budgets including recommended expenditures and revenue sources for the ensuing fiscal year and any other information in such form and detail as the County Executive shall determine and as may be prescribed by law. These budgets shall be consistent with six-year programs. A summary shall be submitted with the budgets containing an analysis of the fiscal implications for the County of all available budgets of any agencies for which the Council sets tax rates, makes levies, approves programs or budgets.

As discussed, Charter § 305 gives the Council the authority to "add to, delete from, increase or decrease any appropriation item in the operating or capital budget." The Council clearly did not divest itself of authority to overhaul the budget submitted by the Executive in the way that the General Assembly is precluded from altering that submitted by the Governor.

Section 510, which was adopted in 1980, states, "The Montgomery County Council shall provide by law for collective bargaining with binding arbitration with an authorized representative of the Montgomery County police officers. Any law so enacted shall prohibit strikes or work stoppages by police officers. (Election of 11-4-80.)." The Council enacted the collective bargaining laws at issue pursuant to Charter § 510 and imposed binding arbitration on the Executive, but not on itself. *See* footnote 7 and accompanying text, *infra.* It is evident that the Council retained nearly all the discretion in enacting a budget, subject only to the Executive's line-item veto power.

### C. Statutory Interpretation

■ Recently, in *FOP 35 I*, the Court of Appeals stated the following regarding statutory interpretation:

It is a well-settled principle that the primary objective of statutory interpretation is to ascertain and effectuate the intention of the legislature. The first step in this inquiry is to examine the plain language of the statute, and if the

words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. Thus, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. Furthermore, words may not be added to, or removed from, an unambiguous statute in order to give it a meaning not reflected by the words the Legislature chose to use[.]

*FOP 35 I,* 427 Md. at 572–73, 50 A.3d 579 (quoting *Dep't of Human Resources v. Hayward,* 426 Md. 638, 649–50, 45 A.3d 224 (2012) (internal citations and quotation marks omitted)). "Charters are subject to the same canons of statutory construction that apply to the interpretation of statutes." Just as the cardinal rule of statutory interpretation is to ascertain the intention of the legislature, so it is "the cardinal rule of charter interpretation." *Mayor & City Council v. Bunting,* 168 Md.App. 134, 141, 895 A.2d 1068 (2006) (internal citations and quotation marks omitted). The Court of Appeals has said:

> where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986) (internal citations omitted).

Even under the plain meaning rule, however, we do not ignore the Legislature's purpose if it is readily known ... [and] may ... consider the particular problem or problems the Legislature was addressing, and the objectives it sought to attain.

*Maryland–Nat'l Capital Park & Planning Comm'n v. Anderson,* 164 Md.App. 540, 569–70, 884 A.2d 157 (2005) (internal citations omitted). "[W]e are obligated to construe the statute as a whole, so that all provisions are considered together and, to the extent possible, reconciled and harmonized." *Id.* at 570, 884 A.2d 157 (citations omitted). A statutory provision should be interpreted in the context of the entire statutory scheme, and reading the various provisions together and giving effect to each can aid in determining the intent of the legislature. *Office of the Pub. Defender,* 413 Md. 411, 464, 993 A.2d 55; *see Gordon Family P'ship v. Gar On Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997).

■ Thus, viewing § 303 in context of the entire Charter is instructive. Section 302 of the Charter, entitled "Six Year Programs for Public Services, Capital Improvements, and Fiscal Policy," states:

The County Executive shall submit to the Council, not later than January 15 of each even-numbered year, a comprehensive six-year program for capital improvements. The County Executive shall submit to the Council, not later than March 15 of each year, comprehensive six-year programs for public services and fiscal policy. The six-year programs shall require a vote of at least five Councilmembers for approval or modification. Final Council approval of the six-year programs shall occur at or about the date of budget approval.

The public services program shall include a statement of program objectives and recommend levels of public service by the County government, and shall provide an estimate of costs, a statement of revenue sources, and an estimate of the impact of the program on County revenues and the capital budget.

The capital improvements program shall include a statement of the objectives of capital programs and the relationship of capital programs to the County's long-range development plans; shall recommend capital projects and a construction schedule; and shall provide an estimate of costs, a statement of anticipated revenue sources, and an

estimate of the impact of the program on County revenues and the operating budget. The capital improvements program **shall, to the extent authorized by law, include** all capital projects and programs of all agencies for which the County sets tax rates or approves budgets or programs. The Council may amend an approved capital improvements program at any time by an affirmative vote of six Councilmembers.

The fiscal program shall show projections of revenues and expenditures for all functions, recommend revenue and expenditure policies for the program period and analyze the impact of tax and expenditure patterns on public programs and the economy of the County.

**The County Executive shall provide such other information relating to these programs as may be prescribed by law.**

All capital improvement projects which are estimated to cost in excess of an amount to be established by law or which the County Council determines to possess unusual characteristics or to be of sufficient public importance shall be individually authorized by law; provided however, that any project declared by the County Council to be of an emergency nature necessary for the protection of the public health or safety shall not be subject to this requirement if the project is approved by the affirmative vote of six Councilmembers. Any project mandated by law, statutory or otherwise, interstate compact, or any project required by law to serve two or more jurisdictions shall, likewise, not be subject to this requirement. The County Council **shall prescribe by law** the methods and procedures for implementation of this provision.

(Emphasis added).

Just as in Charter § 303, in the above-cited section of the Charter, the County Executive is required to include in the six-year plan any "other information ... as may be prescribed by law." The Council may amend an approved capital improvement program at any time by an affirmative vote of six

Councilmembers. Here, the Charter again reserves to the Council the authority to amend the County Executive's submissions. Section 303 requires the County Executive to make the budget consistent with these six-year programs, a clear and uncontested limit on the County Executive's discretion.

The Council retains the authority to limit the County Executive's power through legislation in other Charter provisions as well. Section 217, entitled "Reorganization of the Executive Branch," states that "[t]he Council may prescribe **by law** the organization of the Executive Branch of County Government." (Emphasis added). Section 309, entitled "Transfer of Funds," permits the County Executive to "transfer an unencumbered appropriation balance within a division or between divisions of the same department" but allows the Council to limit that authority in stating that "[t]ransfers between departments, boards or commissions, or to any new account, shall be made only by the County Council upon the recommendation of the County Executive." Section 501, entitled "Disaster–Continuity of Government During Emergencies," states:

> In order to ensure continuity of government during an emergency caused by a disaster or enemy attack, the Council shall prescribe **by law** for the temporary suspension of specific provisions of this Charter and for temporary succession to the powers and duties of public offices whether filled by election or appointment.

(Emphasis added). The Charter affords the Council the authority to control the County Executive's action or limit the County Executive's discretion by enacting laws specific to more general Charter provisions.

Moving on, the Charter provision in question, § 303, is not ambiguous. It requires, as the Umpire found, the County Executive to include information "required by law" in the proposed budget. The County argues that "other information" does not need to be included in the budget, and that so long as the information is transmitted to the Council by April 1, the County Executive has satisfied his obligation. We

disagree. Parsing the sentence into its component parts results in the following:

The County Executive shall submit to the Council, not later than January 15 and March 15, respectively of each year, proposed capital and operating budgets including [1] recommended expenditures and revenue sources for the ensuing fiscal year and [2] any other information in such form and detail [a] as the County Executive shall determine and [b] as may be prescribed by law.

The disputed provision requires that the County Executive "includ[e]" in the budget "information in such form and detail" that is "prescribed by law" in addition to information that he chooses to include in his discretion. "Other information" cannot be separated from "including" in the way that the County and the circuit court suggest. MCC § 33–80(g) dictates what collective bargaining information must be included in the budget, discussed *infra.*

Charter § 510 is also not ambiguous. This section gave the Council the authority to enact collective bargaining laws by stating that the "Council shall provide by law for collective bargaining with binding arbitration ..." The Council abided by that mandate by enacting MCC §§ 33–75 to 33–85. Those laws are binding on the County Executive as well as the employees to which they relate. If the County Executive, as the employer who is required to be bound by an arbitrator's decision, can effectively undo an arbitrator's decision by refusing to include any agreement in the budget proposal that requires appropriation, then an intractable conflict results. *See Atkinson,* 428 Md. at 748 n. 9, 53 A.3d 1184 (discussing that if the legislative body is required to have the "discretion to refuse to fund a binding arbitration award, then there can never be binding arbitration").

We are required by another canon of statutory construction to " 'avoid constructions that are illogical, unreasonable, or inconsistent with common sense.' " *Bunting,* 168 Md.App. at 142, 895 A.2d 1068 (quoting *Nesbit v. Gov't Emps. Ins. Co.,* 382 Md. 65, 75, 854 A.2d 879 (2004)). The *Bunting* Court

stated by way of example that Montgomery County had used its code to "define the boundaries of what had been granted in [its] charter[ ]." *Id.* at 146, 895 A.2d 1068. Thus, in the MCC, the Council defined the boundaries of the County Executive's budgetary discretion granted generally in Charter § 303 as related to collective bargaining agreements. Such an interpretation is consistent with the other Charter provisions that provide for the Council to supplement Charter requirements by enacting legislation.

The Court of Appeals explained that " 'if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute.' " *Atkinson,* 428 Md. at 743, 53 A.3d 1184 (quoting *State v. Harris,* 327 Md. 32, 39, 607 A.2d 552 (1992)). Moreover, "[w]hen … two statutes conflict and one is general and the other specific, the statutes may be harmonized by viewing the more specific statute as an exception to the more general one." *Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 306, 835 A.2d 1175 (2003) (citations omitted).

Here, the County Executive has discretion as to what to recommend in the budget pursuant to Charter § 303, except where otherwise constrained by the later-enacted § 510 and collective bargaining laws. Interpreting the phrase "as otherwise required by law" in § 303 to exclude the collective bargaining provisions of the MCC is to render the words meaningless. Such an interpretation violates the canon of statutory interpretation requiring that no word is rendered superfluous or meaningless and, as discussed, would require interpreting § 303 inconsistently with rest of the Charter. *Atkinson,* 428 Md. at 744–45, 53 A.3d 1184; *see also Office of Pub. Defender,* 413 Md. at 465, 993 A.2d 55.

An amendment to the Charter, such as § 510, "is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter." *Bunting,* 168 Md.App. at 147, 895 A.2d 1068 (citation omitted). Unlike the cases cited by the parties in which charter provi-

sions were invalidated by virtue of being too specific, or in the nature of "legislative" schemes, the County's argument is that § 510 is not specific **enough** because it does not require the County Executive to include an arbitrator's award in the proposed budget. *See Griffith v. Wakefield,* 298 Md. 381, 470 A.2d 345 (1984); *Cheeks v. Cedlair Corp.,* 287 Md. 595, 415 A.2d 255 (1980); *Md. Classified Emps. Assoc. v. Anderson,* 281 Md. 496, 380 A.2d 1032 (1977); *Wicomico Cnty. Fraternal Order of Police v. Wicomico Cnty.,* 190 Md.App. 291, 988 A.2d 555 (2010).

We find this argument unpersuasive and contradicted by the Montgomery County Attorney's previous opinion that § 511, which allows for collective bargaining with arbitration or impasse procedures for County employees other than police and firefighters, permits the Council to delegate the County Executive's responsibilities to a third-party. In a memorandum dated July 22, 1998, from the Office of the County Attorney to the Council, the County Attorney expressed the view that "delegating the County Executive's decision-making authority with respect to a collective-bargaining agreement to a private arbitrator" would not "amount to an unlawful delegation of the executive power assigned to the County Executive by § 201 of the Charter" because Charter § 511 authorizes the Council to provide for such delegation through legislation. The July 22, 1998 memorandum states that "[t]he legislative history concerning Charter § 511 confirms that § 511 was intended to authorize a binding dispute resolution process." The County Attorney concluded:

> Unless authorized by the County Charter, the Council would be without the authority to enact legislation to impose a binding dispute-resolution process on the exercise of an executive function—like agreeing to a collective bargaining agreement—by the County Executive. But Charter § 511 does authorize the Council to enact legislation providing for arbitration to resolve collective bargaining impasses.

The Court of Appeals has stated that "absent authorization from the county charter or State public general law, [a] local [collective bargaining] ordinance could not validly provide for

the delegation to others of certain duties involving the exercise of discretion specifically assigned by a county charter to the county executive and council" such as the budget. *Fraternal Order of Police v. Baltimore Cnty.,* 340 Md. 157, 170, 665 A.2d 1029 (1995) (citing *Freeman v. Local 1802,* 318 Md. 684, 691, 569 A.2d 1244 (1990); *Anne Arundel Cnty. v. Fraternal Order,* 313 Md. 98, 543 A.2d 841 (1988); *Md. Cl. Emp. Ass'n., Inc. v. Anderson,* 281 Md. 496, 380 A.2d 1032 (1977)). The Court also stated:

> Where municipal governments have been authorized by higher law, *i.e.,* state constitutional provisions, or public general laws or municipal charter provisions, to enter into collective bargaining agreements which bind them in the exercise of their legislative discretion, the courts have generally upheld such collective bargaining agreements, rejecting contentions that they amount to invalid abdications or delegations of legislative authority. On the other hand, in the situation where neither a public general law nor municipal charter provision authorized the municipality to bind itself in the exercise of legislative discretion over public employee compensation, the courts have generally taken the position that attempts to do so in collective bargaining agreements or municipal ordinances are invalid.

*Anne Arundel Cnty.,* 313 Md. at 114–15, 543 A.2d 841 (quoting *Anderson,* 281 Md. at 508–09, 380 A.2d 1032). In the instant case, the Charter allows for such delegation because it both permits arbitration in § 511, and subjects the County Executive's budgetary discretion to limitation "as may be prescribed by law" in § 303. The *Atkinson* Court stated:

> Once the voters … made the policy decision [to have binding arbitration in the budget process], Charter § 812 left all of the detail of implementation to the Council for the exercise of its Art. XI–A, § 3 law-making power in Bill 1–03. It covered possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, ten factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement,

post-hearing motion or court action, and implementation of the award as part of the budget process. We hold that Charter § 812 did not unconstitutionally preclude the exercise of the County Council's law-making discretion.

428 Md. at 749–50, 53 A.3d 1184. Clearly the Charter permits limits to budgetary discretion.

As the Umpire explained, requiring the County Executive to participate in the bargaining process but then allowing the County Executive to unilaterally refuse to include the results of that process in the proposed budget pursuant to MCC would foster uncertainty. No county employee would ever know the sincerity with which the County Executive was bargaining, or if the Council would see any agreement reached between the County Executive and the employees. The Council considered the issues that the Charter raises—that the County Executive must consider the fiscal health of the county in submitting a budget—and created a detailed statutory scheme in which an arbitrator must consider several financial factors in determining which party's final offer is the most reasonable. *See* MCC § 33–81(b)(5). The County Executive's argument, raised for the first time in brief, that the County Executive must retain the ultimate discretion on what to include in the budget because of changes in the economy, ignores that the Council reserved for itself the ability to address such circumstances. The Council retained the ability to add or remove items from the proposed budget, including items in any CBA.[7]

---

7. MCC § 33–80(h), unlike in the companion code related to County employees and firefighters, provides for the Council to participate in the bargaining process should it decline to implement a CBA:

*Council review.* On or before May 1, the County Council shall indicate by resolution its intention to appropriate funds for or otherwise implement the agreement or its intention not to do so, and shall state its reasons for any intent to reject any part of the agreement. The council, by majority vote taken on or before May 1, may defer the May 1 deadline to any date not later than May 15. If the Council indicates its intention to reject any part, it shall designate a representative to meet with the parties and present the Council's views in their further negotiations. This representative shall also participate

Similarly, the State has a collective bargaining law codified in Md.Code (1993, 2009 Repl.Vol.), § 3–501 of the State Personnel & Pensions Article ("SPP"), addressing collective bargaining with state employees. Subsection (c) states in pertinent part:

(1) The parties shall make every reasonable effort to conclude negotiations in a timely manner for inclusion by the principal unit in its budget request to the Governor.

* * *

(2)(ii) In the budget bill submitted to the General Assembly, the Governor **shall** include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations, including the actuarial impact of any legislative changes to any of the State pension or retirement systems that are required, as a result of the negotiations, for the fiscal year beginning the following July 1 if the legislative changes have been negotiated to become effective in that fiscal year.

(Emphasis added). Subsection (d) states, regarding a Memorandum of Understanding ("MOU"), which is the equivalent of a CBA and contains all the terms agreed upon during the negotiations: "(2) To the extent these matters require legislative approval or the appropriation of funds, the matters shall be recommended to the General Assembly for approval or for the appropriation of funds."

The Maryland Constitution, unlike the Montgomery County Charter, has no provision expressly requiring collective bargaining or binding arbitration. Nevertheless, the Governor is required to include in his budget amounts necessary to fund

---

fully in stating the Council's position in any ensuing impasse procedure. The parties shall thereafter meet as promptly as possible and attempt to negotiate an agreement acceptable to the Council. Either of the parties may initiate the impasse procedure set forth in Section 33–81. The results of the negotiation or impasse procedure shall be submitted to the Council on or before May 10. If the Council has deferred the May 1 deadline, that action automatically postpones the May 10 deadline by the same number of days.

Notably, the Council is not required to implement any agreement.

any agreement. In *Ehrlich v. Md. State Emps. Union,* 382 Md. 597, 607–08, 856 A.2d 669 (2004), discussing why the Governor was required to sign the MOU or otherwise ratify it, the Court of Appeals stated:

The statute, at least on its face, does purport to limit the Governor's discretion. Section 3–501(c)(2)(ii) requires that "in the budget bill submitted to the General Assembly, the Governor shall include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations. . . ." Given that statutory mandate which, coupled with the Constitutional mandate of Art. III, § 52(4)(g) of the Maryland Constitution, would seem to require at least the incumbent Governor during whose term of office the MOU was signed to include appropriations to fund the MOU provisions, the Legislature obviously wanted to make certain that the Governor personally understood and approved what was in any MOU signed at his direction.

The State requirements are analogous to the situation in Montgomery County. The primary differences between the systems are the amount of control retained by the Council versus the General Assembly, the State collective bargaining provisions do not require binding arbitration or make an agreement reached through arbitration binding on both the employees and the Governor, and at the State level, the governor retains the discretion to ratify the MOU. It is settled that the Governor can be required by ordinary law enacted by the General Assembly to include specific items or funding in the budget. So too can the County Executive.

Additionally, the County's arguments that Charter §§ 510, 510A, and 511 did not put the public on notice that the Council would constrain the County Executive's discretion in preparing a budget as it pertains to collective bargaining are unpersuasive. Charter § 111, entitled "Enactment of Legislation," states:

The Council shall enact legislation only after public hearing upon reasonable notice. No legislation shall be enacted by

the Council unless it receives the affirmative vote of five members of the Council. Legislation containing a section declaring that it is necessary for the immediate protection of the public health, safety, or interest, and enacted by the affirmative vote of at least six members of the Council, shall be expedited legislation. Expedited legislation, as defined in this section, is the emergency legislation referred to in Article XI–A, Section 3, of the Constitution of Maryland. Any vote cast by a member on any legislation shall be recorded in the journal of the Council.

Thus, the provisions in the MCC requiring the County Executive to submit to binding arbitration and to include the results of that arbitration in the budget would, pursuant to the Charter, be made by action of the Council when acting on the County Executive's budget submission. In sum, we can find no persuasive authority supporting the County's position.

### D. Proposing the Budget is a "Legislative Act"

■ The County argues that the County Executive acts in a legislative capacity when submitting a budget proposal to the Council. FOP 35 disagrees, and the Court of Appeals has rejected such an argument several times, stating:

[W]e have an unbroken line of county authorities from the original Provincial county courts to the County Commissioners at the present time, and continuing to a County Council, if one is established under a charter, all authorized to exercise the power of fixing the county expenditures and raising money to defray them. This is, therefore, not a new power conferred upon the counties by Article XI[-]A, but on the contrary is a power always previously exercised by some local agency in every county. It was not exercised, though it was authorized, by the General Assembly, and was not "legislation" in any ordinary sense in which the word is used.

*Schneider v. Lansdale,* 191 Md. 317, 325–26, 61 A.2d 671 (1948) (discussing the proposed Montgomery County charter and holding that "the budget and the appropriation and the tax levy are none of them 'legislation' as the word is used in

[Article XI–A, § 3]"). The Court has stated that a test for determining if an action is legislative versus executive "is whether the [action] is one making new law—an enactment of general application prescribing a new plan or policy—or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect." *Scull*, 249 Md. at 282, 239 A.2d 92 (citations omitted). The Court clarified that a ministerial, rather than legislative action, is one that "is a duty that has been positively imposed by law, and its performance [is] required at a time and in a manner, or upon conditions which are specifically designated[;] ... is absolute, certain, and imperative, involving merely the execution of a set task[;] ... is inflexibly mandatory[; or is] ... done by officers and employees who are required to ... administer the law with little choice as to when, where, how or under what circumstances their acts are to be done." *D'Aoust v. Diamond*, 424 Md. 549, 588–89, 36 A.3d 941 (2012) (internal citations and quotations omitted).

The County points to several federal cases, including a recent case in which the Fourth Circuit stated that "enacting a budget is a legislative act." *Kensington Vol. Fire Dep't, Inc. v. Mont. Cnty.*, 684 F.3d 462, 471 (2012) (citations omitted). While we find this decision instructive, we are bound by the Court of Appeals precedent.[8]

In *Kensington,* Montgomery County volunteer fire and rescue departments ("VFRDs") brought suit against the County and the County Executive claiming that the County Executive reduced funding for VFRDs in retaliation for the VFRDs' opposition to legislation that attempted to impose a fee for ambulance service as a means of raising revenue for the County. The U.S. District Court for the District of Maryland dismissed the suit, in part, on the ground that the County Executive was protected by legislative immunity and the

---

8. Even if submitting the budget as a whole is a legislative act, including the CBA and funding required by law to implement it is a ministerial act as described in *D'Aoust, supra.*

individuals, who were not County employees,[9] could not bring an abusive discharge claim under Maryland law. The appellate court affirmed that dismissal.

The County Executive in *Kensington* submitted the budget cuts as part of a "budget savings plan" on October 5, 2010, "to address the potential loss of revenue" from the defeat of the ambulance bill. *Id.* at 466. The County Executive then proposed a second "savings plan" for FY11 in December 2010. The Council passed a revised FY11 budget with over $32 million in reductions from the budget that was originally enacted in May 2010. *Id.* at 465–66. In evaluating whether the County Executive and Montgomery County Fire Chief Richard Bowers, who supported the proposed cuts before the Council, were entitled to legislative immunity under the tort claim, the Court stated:

> Legislative acts, the ones for which the immunity and privilege are granted, typically involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population. They also generally bear the outward marks of public decisionmaking, including the observance of formal legislative procedures. By contrast, legislators' employment and personnel decisions are generally administrative acts because they most often affect specific individuals rather than formulate broad public policy.

*Id.* at 470–71 (quoting *EEOC v. Wash. Suburban Sanitary Comm'n,* 631 F.3d 174, 184 (4th Cir.2011)).

Applying this test, the *Kensington* Court had "no trouble concluding that enacting a budget is a legislative act." *Id.* at 471 (citing *Bogan v. Scott–Harris,* 523 U.S. 44, 55, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (finding that legislative acts can be performed by an executive branch official)). The Court explained that the County Executive and Bowers were named as defendants "based on their legislative activity in proposing,

---

9. Each VFRD was an independent corporation under Maryland law with the County funding administrative support positions. *Kensington,* 684 F.3d at 465.

submitting, and advocating for a budget" and were, therefore, entitled to legislative immunity from the tort claim. *Id.* at 471.

*Kensington* is distinguishable. It deals with a tort claim for discharge based on the County Executive advocating for budgetary reductions to a previously-enacted piece of legislation— the FY11 budget. It does support an argument that the inclusion of required information in a budget proposal constitutes a legislative, rather than administrative, act.

Further, the County cites to cases that involve the General Assembly's delegation of appropriation authority to the Governor in further support of its argument that budget-making is a legislative function. These cases have only limited relevance to the case *sub judice* because "[t]he Montgomery County budget system differs somewhat from the type of executive budget systems in several other charter counties and at the state government level." *Haub v. Mont. Cnty.*, 353 Md. 448, 450, 727 A.2d 369 (1999) (holding that a complaint challenged a legislative act only **after** the Council had acted on the Howard County Executive's budget submission). Nevertheless, even if the County Executive's acts could be construed as legislative, these cases support our conclusion that the Charter's limit of the County Executive's budgetary discretion was proper.

In *Judy v. Schaefer*, 331 Md. 239, 262, 627 A.2d 1039 (1993), the Court of Appeals explained that "Article III, § 52, allows the Governor to act in a way that would otherwise be considered legislative; the Governor has a major legislative-type role with respect to the budget." (Citing *Mandel v. O'Hara*, 320 Md. 103, 121–25, 576 A.2d 766 (1990) (holding that Governor's action in vetoing legislation is a legislative act)). The Court has made clear that "[u]nder our cases, delegations of legislative power to executive branch agencies or officials ordinarily do not violate the constitutional separation of powers requirement as long as guidelines or safeguards, sufficient under the circumstances, are contained in the pertinent statute or statutes." *Christ v. Md. Dep't of Natural Res.*, 335 Md. 427, 441, 644 A.2d 34 (1994) (citations omitted); *see also Judy,*

331 Md. at 263–64, 627 A.2d 1039; *Governor v. Exxon Corp.*, 279 Md. 410, 440, 370 A.2d 1102 (1977). If the Charter delegates such "legislative power" to the County Executive, as the County argues, then Charter §§ 303 and 510, along with the MCC collective bargaining provisions, are guidelines or safeguards for the exercise of that power.

## II. Prohibited Practice Ruling

Having determined that the Charter permits the Council to legislate what the County Executive must include in the budget proposal, we now turn to the issue of whether the County Executive's failure to include the 2011 Agreement was a prohibited practice. To determine if a prohibited practice occurred, we must determine what the MCC collective bargaining provisions related to the police require.

### A. Interpretation of MCC § 33–80(g)

■ MCC § 33–80(g) mandates that "[i]n each proposed annual operating budget, the County Executive shall describe any collective bargaining agreement or amendment to an agreement that is scheduled to take effect in the next fiscal year and estimate the cost of implementing that agreement." MCC § 33–80(g) also requires that "[a]ny term or condition of a collective bargaining agreement which requires an appropriation of funds or enactment" be transmitted to the Council by April 1, along with "all proposed legislation and regulations necessary to implement the collective bargaining agreement." The final offer selected by the Neutral constituted the parties' final agreement. The Umpire found that MCC § 33–80(g) requires the County Executive to include sufficient funding to implement the CBA in the proposed budget.

The Court has said that a statute or term is ambiguous when it is "reasonably capable of more than one meaning," and that "language can be regarded as ambiguous in two different respects: 1) it may be intrinsically unclear . . .; or 2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514,

551–52, 814 A.2d 469 (2002) (citations and internal quotation marks omitted). The Council's intent as to what is included in the directive "describe" is unclear in MCC § 33–80(g).

As discussed, where we find ambiguity in a statute, we are to determine the legislative intent and also avoid construing a statute in a way that is illogical or inconsistent with common sense. *See Bernstein v. State*, 422 Md. 36, 46, 29 A.3d 267 (2011); *Bunting*, 168 Md.App. at 142, 895 A.2d 1068. In making this determination,

> we are not limited to the words of the statute as they are printed in the [statute]. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

*Kaczorowski v. Baltimore*, 309 Md. 505, 514–15, 525 A.2d 628 (1987). However, we are mindful that the Court was not suggesting "a jettisoning or diminution of the plain meaning rule, or suggest[ing] that we may substitute our judgment for that of the Legislature properly exercised." *Guttman v. Wells Fargo Bank*, 421 Md. 227, 239, 26 A.3d 856, 862–63 (2011). We recognize that the Court was: "(1) cautioning against interpretations that would lead to an[ ] absurd result.... and (2) authorizing courts, in the interest of completeness, to look at the purpose of the statute and compare the result[s] obtained[.]" *Id.* at 863 (citations omitted).

The Charter requires binding arbitration. The MCC requires that the parties execute any agreement negotiated between them or imposed through impasse procedures. The entirety of § 33–80(g) directs the County Executive to submit any CBA, along with the cost of implementing that agreement and the proposed legislation required to implement it. Our precedent is clear; we are to read the collective bargaining

statutory scheme as a whole to discern the Council's intent. The sister statute to § 33–80(g) and most recent iteration of collective bargaining law, § 33–153($l$), clearly expresses the Council's intention—that the County Executive is to include the funding necessary to implement any CBA in the proposed budget so that the Council can then review it.[10] This is consistent with MCC § 33–80(h), which requires the Council to "indicate by resolution its intention to appropriate funds for or otherwise implement the agreement or its intention not to do so" and if the intention is not to fund, to return to negotiations with FOP 35 and the County Executive. Interpreting § 33–80(g) to mean that the County Executive is not required to include any CBA in the proposed budget with sufficient funding to implement it would frustrate the purpose of § 33–80(h) and render § 33–80(g) out of harmony with the most recent collective bargaining statute.[11] Such an interpretation is illogical and the Umpire correctly concluded that the County Executive is required to include sufficient funding to implement the Final Agreement in the FY12 Budget.

---

**10.** The statutes are identical except that § 33–153($l$), pertaining to fire fighters, adds the following sentence: "The annual operating budget must include sufficient funds to pay for the items in the parties' final agreement."

**11.** It is worth noting that in 1991, the then-Executive was charged with committing a prohibited practice for the same conduct that is at issue in the instant case. In 1991, faced with the "declining" financial situation of Montgomery County, the then-Executive failed to include sufficient funding to implement CBAs with county employees and fire fighters. In a memorandum dated March 15, 1991, to the Council (with the current Executive presiding as Council President), the Executive explained that in response to the findings that his actions constituted a prohibited practice and in lieu of litigation, he was submitting addendum to his proposed budget that included sufficient funding to implement the CBAs and reduce spending in other areas accordingly. Charter § 510A, and MCC § 33–153($l$) were adopted several years later. MCC § 33–153($l$) explicitly requires the proposed budget to include sufficient funding to implement any CBA between the County and the fire fighter's union. It is reasonable to conclude that the Council, aware of the potential for recurrence of the 1991 situation, added the express language in the later statute to clarify its intent that any CBA be included in the proposed budget from the Executive.

## B. The County Executive's Actions Constituted a Prohibited Practice

 The County avers that the County Executive submitted the Final Agreement to the Council, albeit not as part of the FY12 Budget. We agree with the Umpire and are not persuaded by the County's argument that FOP 35 had ample opportunity to advocate for the Council to reject the County Executive's budget and implement the Final Agreement. As discussed, the statute requires the Final Agreement to be included in the budget with sufficient funding.

The County Executive's FY12 Budget did not include the Final Agreement, or even a description of the Final Agreement. Under "Collective Bargaining," the FY12 Budget stated:

> The Executive's budget recommendations regarding employee group health insurance cost sharing, retirement plans, and employee salaries are not consistent with the arbitrated awards for the Fraternal Order of Police (FOP), Lodge 35; International Association of Fire Fighters (IAFF), Local 1664; the Municipal and County Government Employee Organization (MCGEO), Local 1994; and the Montgomery County Volunteer Fire Rescue Association (MCVFRA). As required by Chapters 33 and 21, the County Executive will provide the Council with the cost and other details necessary to implement these arbitration awards.

> The County Executive is recommending a change to the cost sharing arrangements for active County Government employees for their group insurance and retirement plans. Effective July 1, the Executive is proposing a three-tiered approach to group insurance cost sharing that would establish a 70/30 cost sharing arrangement for lower compensated employees and requiring middle and higher income employees to pay a greater share of the cost of group insurance coverage. The Executive is also recommending plan design changes to prescription drug coverage.

In addition, the Executive recommends that employees in the defined benefit retirement plans pay two percent more of covered compensation for their retirement benefits and that the County's contribution for employees in the RSP and GRIP be reduced by two percent of covered compensation.

These changes will reduce the ongoing cost of compensation for the County and produce real, sustainable savings in the operating budget in the short and long term. Both proposals outlined above are aligned with the recent recommendations made by the County's Office of Legislative Oversight as a way to bring long-term sustainability to employee benefit expenses.

\* \* \*

If the arbitrated award for FOP, which provided for an increment and movement into the longevity step, had been included in the recommended budget, it would have resulted in additional FY 12 expenditures of $1.5 million, with a fully annualized cost of $2.3 million. If the arbitrated award for MCVFRA had been included, it would have resulted in additional expenditures of $234,400 related to higher costs for the nominal fee and Association operating expenses. If service increments or step increases were added to the budgets for all agencies the tax supported cost would be $36.5 million including $5.6 million for Montgomery County Government; $28.0 million for Montgomery County Public Schools; $2.0 million for Montgomery College; and $0.9 million for the Maryland National Capital Park and Planning Commission.

The County does not direct us to, and our review of the record does not demonstrate, any documentation that the County Executive provided the Council with the Final Agreement or with all the proposed legislation necessary to implement the Final Agreement. Even if the County Executive had complied with the requirements of 33–80(g), and we do not so hold, such action is not dispositive of the prohibited practice

charge, unless the statute requires no more of the County Executive.

MCC § 33–82(a)(8) makes it a prohibited practice for the County Executive to "[d]irectly or indirectly oppos[e] the appropriation of funds or the enactment of legislation by the county council to implement an agreement reached between the employer and the certified representative pursuant to his article[.]" The Umpire found that:

> The County Executive's actions in this case have effectively gutted the collective bargaining process mandated by the PLRA. The PLRA contemplates that agreements reached through collective bargaining will be binding on both parties—*i.e.*, on the Union and on the County Executive—and that the role of preventing use of public revenues to fund provision of an agreement that is found not to represent an appropriate allocation and expenditure of County resources rests with the County Executive. Accordingly, the County Executive must faithfully bargain in good faith wages, benefits, and other terms and conditions of employment that are believed by the County Executive to be appropriate at the time that the negotiations are concluded. Then, the County Council through its review process and the post-review negotiation and impasse procedures reviews the executed collective bargaining agreements and interest arbitration awards to the time that they must be funded, to determine if they are deemed appropriate and worthy of funding. The actions of the County Executive in this case are tantamount to a partial usurpation of the Council's Review process and render collective bargaining agreements reached in good faith negotiations through a give and take process no longer being binding upon the County Executive to the extent any funding is required to implement those provisions.

The Umpire's conclusions are supported by a Memorandum dated March 29, 2011, from the County Executive to the Council, with the subject "Fiscal Impact Statement—FY12 Labor Agreements between Montgomery County Government and Municipal and County Government Employees Organization (MCGEO), Local 1994, International Association of Fire

Fighters (IAFF), Local 1664, Fraternal Order of Police, Lodge 35, and Montgomery County Volunteer Fire Rescue Association (MCVRFA)," which briefly explains what each union was awarded in arbitration, but then explains in detail why the County Executive "firmly believes such restructuring is the most viable option available to develop a budget that is fair to taxpayers and employees and which moves toward achieving our long-term objective of fiscal responsibility." The Memorandum implies that the County Executive's proposals are the only way to save the County "nearly $30 million in FY12." The attachments to the Memorandum are fiscal impact statements written so as to illustrate what the awards will cost the County and are not a side-by-side comparison of the County Executive's final offer and the respective CBAs.

The Charter does give the County Executive unfettered discretion to determine how the information is to be presented to the Council. As discussed, the Charter requires the County Executive to include the "information in such form and detail" as prescribed in the relevant MCC provisions, which includes a "good faith effort to have such term or condition [requiring an appropriation of funds or enactment of legislation to implement] implemented by Council action." MCC § 33–80(g). The County Executive's description of the arbitrated award is clearly designed to sway the Council into disfavoring it; this indirect interference is a prohibited practice. We agree that the Umpire correctly found that the County Executive committed a prohibited practice.

The County argues that the County Executive's actions fall under MCC § 33–83, which states:

> The expression of any views, argument, or opinion, or the dissemination thereof, whether orally, in writing or otherwise, shall not constitute or be evidence of a prohibited practice under any of the provisions of this law nor be grounds for invalidating any election conducted under this law if such expression or dissemination contains no threat of reprisal or promise of benefit.

The County cites no authority in support of its position that this section encompasses the County Executive's budgetary omission, and we have been unable to discern any. A plain reading of the section indicates that it addresses the expression of views regarding the union itself, not the budget or an award. The County has not argued that the County Executive, in refusing to include any part of the award in his budget, was expressing his opinion of FOP 35 and, therefore, § 33–83 does not relieve the County Executive of his statutory budget responsibilities or protects him from a prohibited practice charge.

■ The County also argues that requiring the County Executive to include the Final Agreement in the proposed budget amounts to "[c]ompelling an individual to affirm a belief that the individual does not hold [and] is repugnant to the principals [sic] protected under the First Amendment of the U.S. Constitution." The County Executive is not expressing his views as a private citizen on a matter of public concern when he submits the budget; he is acting in his official capacity as the head of the executive branch.

It is well established that restraints may be imposed "on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (citation omitted). The instant case does not present a situation in which the County Executive is precluded from exercising his right to speech. In fact, as the Umpire found, the County Executive is required to advocate his views in the bargaining process, up to the submission of a final offer, should the parties reach an impasse. The statute requiring the County Executive to submit an arbitrated award promotes the efficiency of the budget and collective bargaining processes. *See Borough of Duryea v. Guarnieri*, —— U.S. ——, 131 S.Ct. 2488, 2500, 180 L.Ed.2d 408 (2011) ("If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern.").

### III. Legislative Immunity

 FOP 35 argues that the County Executive has no "common law ... official immunity" in this case because the "failure and refusal of the County Executive to submit a budget compliant with the PLRA is not a legislative function, but an 'executive decision.'" *Haub,* 353 Md. at 461, 727 A.2d 369. The County argues that because proposing a budget is tantamount to "introducing legislation," the County Executive "is also clothed with legislative immunity and cannot be called to account before an arbitrator for an exercise of his legislative discretion." FOP 35 counters that the cases cited by the County are distinguishable because they involve tort causes of action against government officials or, in the case of *Mont. Cnty. v. Schooley,* involved deposing a member of the legislative branch. 97 Md.App. 107, 108, 627 A.2d 69 (1993). *See Mandel v. O'Hara,* 320 Md. 103, 576 A.2d 766 (1990); *Dist. Heights v. Denny,* 123 Md.App. 508, 719 A.2d 998 (1998).

The Court of Appeals explained that a "governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice." *D'Aoust,* 424 Md. at 586, 36 A.3d 941. As FOP 35 argues, an action was not brought against the County Executive in tort, and no personal liability was sought to be imposed. *See Mandel,* 320 Md. at 134, 576 A.2d 766 (regarding a claim against state governor in tort for conspiracy and fraud in vetoing legislation). However, this Court has recognized that the immunity broadly protects local legislators from having to defend their legislative actions in suit. *State v. Holton,* 193 Md.App. 322, 368, 997 A.2d 828 (2010).

Assuming, *arguendo,* that the County Executive's inclusion of funding to implement any CBA is legislative, that does not compel the conclusion that the County Executive's actions during that process cannot be evaluated for the existence of a prohibited practice. The common themes of the decisions

addressing immunity are the function being performed by the official and the amount of discretion involved in the performance of that function. However, the policy behind the immunity is to refrain from chilling the ability of officials to exercise their discretion in carrying out their official duties. As the Court of Appeals stated in *Mandel:*

> The Supreme Court noted that official immunity apparently rests on two rationales, (1) the injustice of subjecting to liability an officer who is legally required to exercise discretion, particularly absent bad faith, and (2) the danger of deterring willingness to exercise judgment with decisiveness posed by the threat of liability.

320 Md. at 116–17, 576 A.2d 766 (citation omitted).

As discussed, the County Executive has no discretion, by enactment of the Council, regarding whether to include funding to implement the Final Agreement in the proposed budget. Therefore, neither of the rationales raised by the Court in *Mandel* apply. The concerns about the County Executive's ability to exercise his discretion are legitimate, but the Council provided an opportunity for the County Executive to have discretion—during the collective bargaining process itself. Once that process is complete, by agreement or impasse, the Council stripped the County Executive of any discretion regarding the inclusion of the CBAs and their funding in the budget, making the function ministerial.

Moreover, any immunity arising from the Executive's "legislative" activities is "a matter of Maryland common law." *Mandel,* 320 Md. at 134, 576 A.2d 766. As a charter county, the Council can change the common law by statute. *County Council for Mont. Cnty. v. Investors Funding,* 270 Md. 403, 416–19, 312 A.2d 225 (1973). The Council did so by enacting the prohibited practice provisions of the MCC. Accordingly, we hold that the County Executive is not entitled to invoke legislative immunity to avoid being "called to account" for a prohibited practice charge.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED**

FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.